*741 OPINION OF THE COURT
Andrew V. Siracuse, J.
The plaintiff in this products liability case claims he was injured on August 19, 1994, by the malfunction of a Sears Craftsman gear puller. He sued both Sears and Emerson Electric Co. (Emerson), the company he believed manufactured the device. The action against Sears was dismissed for reasons that do not involve this action, but the case against Emerson, commenced just prior to the expiration of the Statute of Limitations, has continued and is the subject of Emerson’s present motion. Emerson moved shortly after the service of the answer to dismiss the complaint, arguing that its subsidiary, Western Forge Corporation (Western Forge), a separate corporation, had manufactured the gear puller. Although Western Forge was and is wholly owned by Emerson, Emerson has argued that it does not so dominate the day-to-day activities of Western Forge as to justify holding it responsible for its actions. The plaintiff, not surprisingly, rejects these arguments, but has also cross-moved to permit the tardy commencement of an action against Western Forge, justifying this by the theory of “relation back”: the plaintiff claims that Western Forge had full knowledge of the claim and would not be prejudiced by allowing commencement of an action at this date.
The court finds Emerson’s arguments persuasive insofar as they state the applicable law correctly and address the factual nature of the business relationship between Emerson and Western Forge. The court, however, is not limited to this inquiry. Although Emerson is not legally bound to answer for its subsidiary’s conduct, under the peculiar facts of this case and because of the history of communications between Emerson and plaintiffs counsel, the court holds that Emerson should be estopped from denying its responsibility.
This action was commenced only after an extended period of discussion and correspondence which began as early as February 1995. The papers show a letter from Mary Ruden, a claims administrator for Emerson, dated February 8, 1995, which begins by stating that the plaintiffs claim “may involve Emerson Electric Co.’s Western Forge Corporation.” Ms. Ruden goes on: “Because Emerson Electric Co. is self-insured for this type of claim, I am writing to obtain the information necessary to give your claim further consideration.” She then asks plaintiffs counsel to ship the unit to Western Forge Corporation, in Colorado. The return address of the letter, however, is Emerson Electric Co., in St. Louis.
*742 Ms. Ruden next wrote on June 2, 1995, renewing the request to ship the product and enclosing a shipping voucher “to ship the product directly to our representative at our expense.” This letter does not mention Western Forge and, like all the others, is on Emerson letterhead.
A June 19 letter from Ms. Ruden outlines “the standard test protocol for Western Forge tools”. In October, the two parties were scheduling an examination of the tool in Rochester, and on November 30, 1995, Ms. Ruden thanked plaintiffs counsel “for allowing my representative to examine the gear puller”, but asked for more tests and offered to travel to Rochester.
The action was commenced on August 15, 1997, by filing a summons and complaint that identified Emerson Electric Co. as the designer, manufacturer and distributor of the gear puller. Emerson’s amended answer, dated September 9, 1997, denied this assertion, in the same paragraph that denied 10 of the complaint’s paragraphs. (Emerson denied all but two paragraphs of the complaint: it admitted that it was a foreign corporation and it denied knowledge as to the plaintiffs residence.) The amended answer contained five affirmative defenses, such as the plaintiffs negligence and the alleged abuse or misuse or alteration of the gear puller. Western Forge is not mentioned in this document.
One week after the amended answer was dated, Emerson moved to dismiss the complaint on the ground that Western Forge was the manufacturer. This court denied the motion without prejudice so that depositions might be had on the relationship between Western Forge and Emerson. Those depositions have been held, and Emerson has once again moved to dismiss.
The Court of Appeals has said: “As a general rule, the law treats corporations as having an existence separate and distinct from that of their shareholders and, consequently, will not impose liability upon shareholders for the acts of the corporation (Port Chester Elec. Constr. Corp. v Atlas, 40 NY2d 652, 656). Indeed, the avoidance of personal liability for obligations incurred by a business enterprise is one of the fundamental purposes of doing business in the corporate form (see Rapid Tr. Subway Constr. Co. v City of New York, 259 NY 472, 487-488). It is true that, on occasion, the courts will disregard the separate legal personality of the corporation and assign liability to its owners where necessary ‘to prevent fraud or to achieve equity' (International Aircraft Trading Co. v Manufacturers Trust Co., 297 NY 285, 292). But, such liability can never *743 be predicated solely upon the fact of a parent corporation’s ownership of a controlling interest in the shares of its subsidiary. At the very least, there must be direct intervention by the parent in the management of the subsidiary to such an extent that ‘the subsidiary’s paraphernalia of incorporation, directors and officers’ are completely ignored (Lowendahl v Baltimore & Ohio R. R. Co., 247 App Div 144, 155, affd 272 NY 360, supra)” (Billy v Consolidated Mach. Tool Corp., 51 NY2d 152, 163).
The defendant cites a variety of cases on piercing the corporate veil, suggesting in doing so that this is only appropriate where there has been wrongdoing on the parent’s part. This, however, is the doctrine applied to personal liability for corporate acts, which is somewhat different from the standard for holding one corporation liable for the acts of a subsidiary; as the Second Department has stated:
“ ‘The corporate veil will be pierced (1) to achieve equity, even absent fraud, where the officers and employees of a parent corporation exercise control over the daily operations of a subsidiary corporation and act as the true prime movers behind the subsidiary’s actions (see Van Valkenburgh, Nooger & Neville v Hayden Pub. Co., 30 NY2d 34, mot for rearg den 30 NY2d 880, cert den 409 US 875; Fiur Co. v Ataka & Co., 71 AD2d 370; Astrocom Electronics v Lafayette Radio Electronics Corp., 63 AD2d 765; 13 NY Jur 2d, Business Relationships, § 30), and/or (2) where a parent corporation conducts business through a subsidiary which exists solely to serve the parent (see Port Chester Elec. Constr. Corp. v Atlas, 40 NY2d 652; Educational Beneficial v Reynolds, 67 Misc 2d 739 ).’ (Matter of Sbarro Holding, 91 AD2d 613, 614.)
“To pierce the corporate veil between a parent corporation and subsidiary, the parent corporation must exercise complete domination and control in the matter (see, Gulf & W. Corp. v New York Times Co., 81 AD2d 772, 773). Stock control, interlocking directors and interlocking officers are in and of themselves insufficient facts to justify the imposition of such liability on the parent corporation (see, Musman v Modern Deb, 50 AD2d 761, 762). Control by the parent over the subsidiary’s everyday operations will, however, render the parent liable for the subsidiary’s acts (see, Fiur Co. v Ataka & Co., 71 AD2d 370, supra)” (Pebble Cove Homeowners’ Assn. v Fidelity N. Y., 153 AD2d 843).
However, even under this more lenient test the defendant has the stronger argument. What appears from Emerson’s annual reports and the deposition testimony is only a fairly high *744 degree of integration of Western Forge with Emerson. Western Forge is audited by Emerson officials; a claims review is conducted by Emerson personnel (which accounts for the letters that give Emerson as the manufacturer); cases are settled by Emerson staff with input from the subsidiary; Emerson maintains centralized banking for Western and its other subsidiaries; employees have transferred between parent and subsidiaries; and Emerson cultivates the personnel in its subsidiaries with an eye to promotion. However, the “day-to-day” control that is required to pierce the corporate veil is not present. Emerson does not market Western Forge’s products. There is no evidence of direct control in marketing or production decisions, and none in personnel. Transfers of employees are possible, but it is not so common or all-pervasive as to create a single employment unit within the corporation. Certainly, Emerson keeps a close eye on Western Forge, as it does on all its subsidiaries; but it cannot be said that the parent here so dominated the subsidiary that the two should be considered one and the same organization. The essence of the test is the parent’s “complete” domination, and the evidence here falls far short of that necessary to satisfy the standard.
Plaintiff also seeks to add Western Forge as a defendant, relying on the “relation back” doctrine in CPLR 203 (b). This provision does allow an unsued party to be added after the expiration of the Statute of Limitations, but only if the unsued defendant is united in interest with the named defendant (see generally, Buran v Coupal, 87 NY2d 173). Procedurally, this claim is difficult to permit. Western Forge is not before the court, and the only proper way to raise the issue would be for plaintiff to sue Western Forge and raise the relation-back doctrine in response to a motion to dismiss based on Statute of Limitations grounds. However, there is no need for such a complex process, as the relation-back ruling will stand or fall with the one on piercing the corporate veil. In the Fourth Department (at least) the two are measured by exactly the same standard: “The mere existence of a parent-subsidiary corporate relationship is insufficient to establish a unity of interest between the two corporations (see, Derso v Volkswagen of Am,., 159 AD2d 937, 938-939). In actions such as this, related corporations are united in interest only where one corporation is vicariously liable for the acts of the other (see, Santiamagro v County of Orange, 226 AD2d 359, 360; Derso v Volkswagen of Am., supra, at 939; Raschel v Rish, 120 AD2d 945, affd 69 NY2d 694). In order for vicarious liability to exist, *745 ‘[t]he parent corporation must exercise complete dominion and control [over] the subsidiary’s daily operations’ (14 NY Jur 2d, Business Relationships, § 41, at 119; see, Allen v Oberdorfer Foundries, 192 AD2d 1077).” (Feszczyszyn v General Motors Corp., 248 AD2d 939, 940.)
There is no immediately apparent reason for the identical principles to be applied for these two different remedies, but the Fourth Department has spoken. If Emerson cannot be held vicariously liable for Western Forge’s conduct, then the plaintiff cannot use the relation-back doctrine to allow Western Forge to be sued in what would otherwise be an untimely fashion.
It would appear that plaintiff is left without a remedy. In looking over the whole of the postaccident conduct of the parties, however, the court is distressed by what can hardly be distinguished from a deliberate concealment of the relationship between Western Forge and Emerson Electric Co. The only reasonable conclusion that can be drawn from Emerson’s letters is that it or one of its divisions (rather than a subsidiary) was the manufacturer. The pronouns used by Ms. Ruden — it is always “our” representative — and language such as “Emerson Electric is self-insured”, the reference to “Emerson Electric Co.’s Western Forge Corporation” and the entire conduct of the correspondence all are inconsistent with Emerson’s not being the manufacturer.
Emerson has responded that it never held itself out as anything other than Western Forge’s parent and that it denied that it was the tool’s manufacturer in its answer. Emerson also points to what it claims was the first communication to the plaintiffs attorney, which names Western Forge as the manufacturer.
This letter, dated February 3, 1995, is to Western Forge from Kemper Insurance Companies, evidently the carrier for Sears. Plaintiffs counsel was copied in on this letter, which accompanied the transfer of the file from Kemper to Western Forge; but how this third- or fourth-party letter was supposed to put plaintiff on notice is difficult to see.
It is also difficult to understand the significance of the answer’s denial that Emerson was the manufacturer, since the document denies without comment this, the date of purchase, the accident, the implied warranty of merchantability, and the fact that the plaintiff is alleging that res ipsa loquitur applies, among others. It is not necessary to raise this issue in an affirmative defense; but it is troubling that no mention is made of Western Forge until a few days after the expiration of the *746 Statute of Limitations, and in papers which were prepared almost simultaneously with the answer but which were served shortly thereafter.
Under the circumstances, the court holds that Emerson Electric Co. should be equitably estopped from denying that it is not the manufacturer of the gear puller. The Fourth Department has set out the doctrine in Holm v C.M.P. Sheet Metal (89 AD2d 229, 234-235): “This doctrine precludes a party at law and in equity from denying or asserting the contrary of any material fact which he has induced another to believe and to act on in a particular manner. It ' “rests upon the word or deed of one party upon which another rightfully relies and so relying changes his position to his injury” ’ (Triple Cities Constr. Co. v Maryland Cas. Co., 4 NY2d 443, 448, quoting Metropolitan Life Ins. Co. v Childs Co., 230 NY 285, 292). Parties are estopped to deny the reality of the state of things which they have made to appear to exist and upon which others have been made to rely. It does not operate to create rights otherwise nonexistent; it operates merely to preclude the denial of a right claimed otherwise to have arisen (21 NY Jur, Estoppel, Ratification, and Waiver, §§ 17-18). New York’s rather restrictive view of estoppel requires three elements on the part of the party estopped: (1) conduct which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intent that such conduct (representation) will be acted upon; and (3) knowledge, actual or constructive, of the true facts (21 NY Jur, Estoppel, Ratification, and Waiver, § 21). The elements pertaining to the party asserting estoppel are (1) lack of knowledge of the true facts; (2) good faith reliance; and (3) a change of position (21 NY Jur, Estoppel, Ratification, and Waiver, § 60). These are commonly termed the elements of detrimental reliance.”
The legal term “calculated” is, of course, an objective rather than subjective standard; it speaks to the impression an unbiased observer would receive rather than the deliberate conduct of the party. The court finds that the correspondence between Emerson and plaintiffs counsel was indeed calculated to convey facts contrary to those now asserted, namely that Emerson is not responsible for Western Forge’s conduct. There is also no doubt that Emerson was in possession of the facts at all times, and that plaintiffs counsel relied in good faith upon the reasonable impression created by Emerson’s conduct and sued Emerson and not Western Forge as a result. The only *747 remaining element is the intent that Emerson’s conduct be acted upon. While it is not certain that Emerson intended to induce plaintiff to sue it rather than Western Forge, it is clear that the letters which held out Emerson as the manufacturer and negotiating agent on the claim were intended to be acted upon. At the very least they were representations made in the course of trying to effect a settlement of the claim, and it would be disingenuous for Emerson, which only asserted its lack of responsibility when it was too late for plaintiff to take a different course, to argue that it never intended for the plaintiff to respond to Emerson as if it were the responsible party when it was the one considering and ultimately denying the claim.
Thus, although Emerson does not appear to be legally responsible for Western Forge’s activities, its conduct with respect to the present claim is such as to estop it from denying that responsibility. Its motion is therefore denied, with prejudice. The plaintiff’s cross motion is also denied, but the plaintiff’s attorney may prepare the order, with statutory costs.