RUS, INC., and Recticel Foam Corp., Inc., Plaintiffs,

v.

BAY INDUSTRIES, INC.; and Sac, Inc., Defendants.

No. 01 Civ. 6133(GEL).

United States District Court, S.D. New York.

April 1, 2003.

Roger J. Marzulla, Marzulla & Marzulla, Washington, DC (Henry W. Killeen, Killeen & Killeen, Orchard Park, NY, on the brief), for plaintiffs RUS, Inc., and Recticel Foam Corp., Inc.

Douglas J. Klingberg, Ruder, Ware & Michler, LLSC, Wausau, WI (Walter A. Saurack, Satterlee, Stephens, Burke & Burke, LLP, New York City, on the brief), for defendants Bay Industries, Inc. and SAC, Inc.

## OPINION AND ORDER

LYNCH, District Judge.

This suit arises out of an aborted transaction in which defendant Bay Industries, Inc. ("Bay") was to use its acquisition vehicle, SAC, Inc. ("SAC"), to purchase the stock of Soundcoat Company, a foam manufacturer owned by plaintiff Recticel Foam Corporation ("Recticel").[1] After Bay and SAC declined to close on the transaction, Recticel filed suit, alleging that both Bay and SAC had breached the Stock Purchase Agreement ("the Agreement"). Both sides now move for partial summary judgment on liability, and defendants move to strike certain portions of the declarations submitted in support of plaintiffs' summary judgment motion. Defendants also seek production of certain documents that plaintiffs have withheld. For the reasons discussed below, all motions will be denied.

## BACKGROUND

Plaintiff Recticel is a Belgian company that manufactures sound insulation products, with over 110 international subsidiar-

---

1. Recticel has assigned its interest in this lawsuit to its parent corporation, RUS, Inc. Recticel amended its complaint in November 2002 to reflect that change. (Pls. Mem. at 3 n. 1.)

ies. (Defs. Mem. at 2.) In early January 2001, Recticel agreed to sell the stock of its wholly owned subsidiary, Soundcoat, to Bay for $11.7 million. (Pls. R. 56.1 Statement ¶ 3.) Soundcoat is a foam manufacturing company with plants located in Deer Park, New York, and Irvine, California. (Pls. Mem. at 1–2.) At the contract negotiations, which began around January 17, Bay was represented by Ronn Kleinschmidt, its financial manager, and Lon Roberts, its attorney. (Pls. R. 56.1 Statement ¶ 4.) At the initial meetings, Bay indicated that it planned to use an acquisition vehicle to purchase the Soundcoat stock when the transaction was completed (id. ¶ 5), and Recticel did not object (Jous Dep. at 69–70). Thus, Bay would create another corporation that would be a party to the contract and would receive Soundcoat's stock, avoiding adverse tax consequences to Bay. (Id.) By January 29, Bay had incorporated SAC under Wisconsin law, notified Recticel, and had SAC's name inserted into the Stock Purchase Agreement in Bay's place. (Roberts Aff. ¶ 4; Frankel Dep. at 51–52.)

Both Bay and SAC are wholly owned by their parent corporation, AWS/gb, a holding company owned by Arnold and Gloria Schmidt. (Defs. R. 56.1 Counter-statement ¶ 8.) The Schmidts are the sole officers and directors of AWS/gb and of every corporation that it owns. (Id.) After SAC was incorporated, it did not hold formal meetings (id. at 7), and it was not capitalized (id. ¶ 15). Instead, it was given a revolving bank account, so that any funds in the account were cleared each night and transferred to AWS/gb. (Marzulla Decl. Ex. 4 at 2.) SAC did not have an office or any employees, or any income or debts independent from Bay. (Id.; Defs. R. 56.1 Counter-statement ¶ 12.) Even after SAC was made a party to the Agreement in

place of Bay, Bay's negotiators continued to handle all aspects of the transaction.

The Agreement provided as a condition precedent to SAC's duty to close that Recticel would deliver to SAC a "reasonably satisfactory" Phase I environmental assessment for each Soundcoat facility. (Kleinschmidt Aff. Ex. A § 7.1(f).) The Phase I assessment is "an information gathering device and preliminary investigation of a site to identify potential environmental concerns at a facility" and potential areas of non-compliance with applicable environmental laws. (Pls. R. 56.1 Statement ¶ 18.) When the Phase I investigation identifies concerns that need to be evaluated by "more extensive efforts," a plant typically performs a Phase II site assessment, a detailed examination of all environmental aspects of a site, before undertaking full remediation of the problems. (Id. ¶ 19.) On February 16, the parties received a verbal progress report regarding the Phase I investigation of the Deer Park facility, in which the investigator indicated that he had found seven areas of environmental concern, which would probably require a Phase II investigation. (Killeen Decl. Ex. 1.) The parties dispute whether the issues raised were typical of a plant like Soundcoat, or whether they were more serious environmental problems. (Defs. R. 56.1 Counter-statement ¶ 21.)

About a week before the scheduled closing on March 2, 2001, the parties agreed to a "Minimum Work Plan" that would guide Soundcoat's remediation of some of the environmental issues raised by the Phase I investigation, even before the completion of a Phase II assessment. (Id. ¶ 25.) The parties also negotiated an amendment to the Agreement, which would have provided that Recticel would take responsibility for remedying the environmental problems

both before and after the closing.[2] (Killeen Decl. Ex. 11.) The amendment was never executed, however, and defendants deny that the parties reached an agreement on the text of the amendment. (Defs. R. 56.1 Counter-statement ¶ 29.) Nonetheless, Recticel contends that the parties definitively agreed, at least orally, that Recticel would take responsibility for correcting the problems, and that based on that agreement, defendants accepted the Phase I Report. (Pls. Mem. at 9–10; Killeen Decl. ¶ 11.) Defendants dispute that the negotiations over the environmental issues had any discernible results. (Defs. R. 56.1 Counter-statement ¶ 26.)

It is undisputed that when the parties realized that Soundcoat's environmental problems could not be fully remedied in time for the March 2 closing, they agreed to suspend the Phase II investigation until after the closing. (Defs. R. 56.1 Counter-statement ¶ 30; Killeen Decl. Ex. 9.) The closing was postponed until April 2 anyway, however, because problems arose with Soundcoat's landlords, and the parties continued to negotiate solutions to both the environmental issues and the landlord problems through March. (Pls. Mem. at 12; Killeen Decl. ¶ 20 & Ex. 13.) Recticel contends that the parties agreed that the environmental remediation would remain deferred until after the April closing (Killeen Decl. ¶ 25), but defendants state that the postponement was unnecessary in light of the new closing date, and that their understanding was that Recticel could have gone ahead with the Phase II investigation before the closing. (Defs. R. 56.1 Counter-statement ¶ 30.)

On March 27, Bay's counsel, Lon Roberts, informed Recticel that SAC would not be attending the closing. In a letter sent the same day, Roberts detailed a number of "unresolved" issues that he felt could not be resolved by the closing, most of which centered around the landlords of both Soundcoat facilities. (Wiseman Decl. Ex. 13.) He also stated that, with respect to the Deer Park facility, "Phase II activities . . . must be completed and environmental compliance achieved," but it is not clear from the letter whether he meant that compliance would have to be achieved by the April 2 closing date. (Id. at 2.) Recticel's counsel responded to the landlord issues by stating that it was Bay's attorneys who had been unresponsive to the landlords in the preceding weeks, and that all of the landlord issues could be resolved by the closing. (Id. Ex. 14.) On March 30, Roberts sent another letter to Recticel, stating that Recticel "will not be able to . . . satisfy the conditions to closing required by the stock purchase agreement" because "the New York facility may have serious environmental issues." (Id. Ex. 15.) The closing did not go forward, and in July 2001, Recticel filed this suit. (Pls. Mem. at 16.)

## DISCUSSION

### I. The Parties' Contentions

Recticel now moves for summary judgment on defendants' liability under the Agreement, arguing that defendants anticipatorily breached the Agreement by refusing to close the transaction. (Pls. Mem. at 18.) Recticel asserts that, as a matter of law, it had satisfied all conditions precedent contained within the Agreement, and

2. The proposed amendment did not explicitly modify or remove the condition that Recticel have provided a satisfactory Phase I report before SAC was obligated to close, but it did provide that if its provisions conflicted with the Agreement, the amendment would control. (Killeen Decl. Ex. 12 § 11.) Thus, it is possible that the amendment was intended to modify the condition that Recticel provide a satisfactory Phase I report.

that SAC backed out of the deal because a recent downturn in the profits of both Bay and Soundcoat had made it less enthusiastic about the acquisition. (*Id.* at 19–20.) In addition, Recticel contends that Bay may be held liable for any breach that SAC may have committed, even though it was not a party to the Agreement, because of its control of SAC and its intent to be bound under the contract. (Pls. Mem. at 30–42.)

Defendants also move for summary judgment as to liability, contending that they had no duty to close, because two conditions precedent were not met. (Defs. Mem. at 6.) Specifically, defendants allege that the problems uncovered by the Phase I investigation rendered the Phase I Report not "reasonably satisfactory," and that the problems rendered untrue several of the representations and warranties made by Recticel. (*Id.* at 7, 11.) Thus, SAC did not anticipatorily breach the Agreement when it refused to close because its obligation to close under the Agreement never arose. Defendants also contend that, even if SAC breached the contract, Bay cannot be held liable for that breach because it was not a party to the Agreement, and therefore it must be dismissed from the action. (Defs. Mem. at 13–14.)

In addition, defendants move to strike various portions of the declarations submitted in support of plaintiffs' summary judgment motion, arguing that they are not based on personal knowledge, call for legal conclusions, or violate the sham affidavit rule. Finally, despite the fact that discovery is now closed, defendants assert that they are entitled to the production of the results of the Phase II environmental investigation that was undertaken at Soundcoat's Deer Park facility after the SAC purchase fell through.

## II. *Defendants' Motion To Strike Portions of Declarations*

Defendants move to strike various portions of the declarations of Stephen Wiseman, Phillippe LaCarriere, Phillippe Jous, and Richard Walka, as noncompliant with Fed.R.Civ.P. 56(e) because they "call for legal conclusions," are speculative, or contain inadmissible hearsay. (Defs. Mot. to Strike at 1–3.) In deciding a motion for summary judgment, the Court may consider "supporting and opposing affidavits ... made on personal knowledge" that set forth evidence that would be admissible at trial. Fed.R.Civ.P. 56(e). To the extent that an affidavit or declaration contains material that does not comply with Rule 56(e), the Court may strike those portions, or may simply disregard them. *Larouche v. Webster*, 175 F.R.D. 452, 455 (S.D.N.Y. 1996); *Epstein v. Kemper Ins. Cos.*, 210 F.Supp.2d 308, 313–14 (S.D.N.Y.2002). Thus, rather than parsing each challenged declaration to determine which portions to strike, the Court will disregard any statements that do not comport with Rule 56(e). *Epstein*, 210 F.Supp.2d at 314 (disregarding portions of affidavits, rather than striking them).

Defendants also challenge two portions of the declaration of Phillippe Jous under the sham affidavit rule (Defs. Mot. to Strike at 3–4), which prevents a party from submitting an affidavit that contradicts the party's prior deposition testimony in order to raise an issue of fact sufficient to preclude summary judgment. *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969). Any issue of fact created by the contradiction is not genuine, and therefore cannot serve as a basis on which to deny summary judgment. *Palazzo ex rel Delmage v. Corio*, 232 F.3d 38, 43 (2d Cir.2000).

First, defendants challenge Jous's assertion, in his declaration, that he was

"misquoted" n his deposition. (Jous Decl. ¶ 9.) The transcript of Jous's deposition indicates that when asked about the Phase I report, he stated, somewhat confusingly, "I don't see why the buyer [SAC] wouldn't have considered this Phase I report as unsatisfactory." (Jous Dep. at 88.) In his declaration, Jous states that he meant to say, "I don't see why the buyer would have considered this Phase I report unsatisfactory," (Jous Decl. ¶ 9), and defendants seek to strike this assertion from his declaration. The sham affidavit rule does not apply to these statements, however, because Jous's deposition statement, whether or not correctly recorded, is simply his opinion, and his declaration does not seek to assert different facts, but to clarify a potential typo or confusion.[3] *Corio,* 232 F.3d at 43 (noting that the sham affidavit rule does not apply to later statements that seek to clarify or expand on deposition testimony). In addition, while Jous's deposition statement is relevant to the disputed issue of whether the Phase I report was "reasonably satisfactory" within the meaning of the Agreement, plaintiffs have proffered other evidence as to reasonableness, and do not seek to rely solely on Jous's opinion to counter defendants' claim that the Phase I report was not satisfactory.

Second, defendants challenge Jous's declaration statements that he understood Bay, not SAC, to be the purchaser of Soundcoat, and that Bay's attorneys never stated that Bay would not be the purchaser. (Jous Decl. ¶ 4.) In his deposition, Jous stated that he understood that Soundcoat's stock was actually being sold to SAC, as Bay's acquisition vehicle. (Jous Dep. at 33, 69.) Once again, the sham affidavit rule does not apply to these statements. When Jous's declaration statements are considered in comparison with his deposition testimony as a whole, it is clear that they do not actually contradict his deposition testimony. *Palazzo,* 232 F.3d at 43. In light of the parties' agreement that SAC was a shell corporation whose sole purpose was to receive Soundcoat's stock, a reasonable factfinder could conclude that Jous's declaration statements relate to his impression of Bay's intent to be bound under the Agreement, regardless of the fact that SAC was the actual party to the Agreement. His declaration does not appear to assert, contrary to his deposition, that he did not understand that Soundcoat's stock was being sold to SAC; rather, his point is that despite that technicality, he thought that Bay would be bound under the contract. Thus, the sham affidavit rule does not require that the declaration statements be stricken.

## III. *The Parties' Cross–Motions for Summary Judgment*

### A. *Summary Judgment Standard*

When adjudicating motions for summary judgment, a court must resolve all ambigu-

---

**3.** Of course, defendants would be free to introduce Jous's deposition testimony at trial, as relevant to the reasonableness of defendants' dissatisfaction with the Phase I report, and/or to impeach testimony by Jous along the lines of his declaration. A reasonable factfinder could conclude, however, that the transcription of the double-negatived statement contained a typographical error, or that it reflected confusion, or that Jous simply misspoke. Jous's declaration highlights the ambiguity of his deposition statement, and a reasonable factfinder could credit the declaration over the deposition. The situation is simply not comparable to a case like *Perma Research,* where a witness was unable to point out evidence of defendant's fraudulent intent during his deposition, and then provided an affidavit asserting that defendant's representative had admitted to him that defendant had no intention of performing the contract. *Perma Research,* 410 F.2d at 576–78.

ities in favor of the nonmoving party, although "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996). Summary judgment is then appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

To establish a genuine issue of material fact, the opposing party " 'must produce specific facts indicating' that a genuine factual issue exists." *Scotto,* 143 F.3d at 114 (quoting *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998)); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "If the evidence [produced by the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Pocchia v. NYNEX Corp.,* 81 F.3d 275, 277 (2d Cir.1996) (quoting *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. 2505).

■■■ When interpreting a contract in the context of a summary judgment motion, the Court must decide whether significant contractual ambiguity exists. *Eche-*

*lon Int'l Corp. v. America West Airlines,* 85 F.Supp.2d 313, 317 (S.D.N.Y.2000) (citing *Giles v. City of New York,* 41 F.Supp.2d 308, 318 (S.D.N.Y.1999)). If the language of the contract is "unambiguous and conveys a definite meaning," then the interpretation of the contract is a question of law for the court. *Bourne v. Walt Disney Co.,* 68 F.3d 621, 629 (2d Cir.1995) (citations omitted). If the terms are not clear, the interpretation of the contract becomes a question of fact for the jury and extrinsic evidence of the parties' intent is admissible. *Id.* Further, a court may not draw any inference or give any construction to the terms of a written contract that conflicts with the clearly expressed language of the written agreement. *See, e.g., General Elec. v. Compagnie Euralair,* 945 F.Supp. 527, 529 (S.D.N.Y.1996) (citation omitted).

### B. SAC's Obligation to Perform Under the Agreement

■■■ It is clear that SAC's aborting the transaction on March 30 was an anticipatory breach of the Agreement, unless Recticel had failed to satisfy one or more of the conditions precedent provided in the Agreement, in which case SAC never became obligated to close the transaction. When one party is ready and able to perform the contract, but the other refuses to do so, it has breached the contract, unless its performance was excused. *Tenavision, Inc. v. Neuman,* 45 N.Y.2d 145, 150, 408 N.Y.S.2d 36, 379 N.E.2d 1166 (1978). One such excuse for nonperformance is the failure of conditions precedent specified in the contract, *Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.,* 86 N.Y.2d 685, 690, 636 N.Y.S.2d 734, 660 N.E.2d 415 (1995), and defendants contend that Recticel had failed to satisfy two conditions precedent in the Agreement. Because determining whether SAC's performance un-

der the Agreement was excused will require the resolution of disputed issues of material fact, neither party is entitled to summary judgment as to defendants' liability.

### 1. *Delivery of a "Reasonably Satisfactory" Phase I Report*

Section 7.1 of the Agreement specified various conditions that Recticel had to fulfill before SAC's obligation to "consummate the transaction ... at closing" would arise. (Kleinschmidt Aff. Ex. A § 7.1.) Section 7.1(f) provided that "Seller shall have delivered to Buyer the results of a Phase I environmental assessment and environmental compliance audit for each of [Soundcoat's] facilities ... and Buyer shall be reasonably satisfied therewith." (*Id.* § 7.1(f).) It is undisputed that the Phase I investigation revealed a number of environmental problems, and defendants contend that these problems rendered the report unsatisfactory. (Defs. Mem. at 7.) Recticel argues that defendants' dissatisfaction with the report was unreasonable, because the report raised only minor issues (Pls. Mem. at 21–22), and that even if the report was not reasonably satisfactory, defendants' actions in negotiating for the remediation of the environmental issues either resulted in a waiver or modification of the condition, or prevented the condition from occurring, so that defendants may not now rely on it to avoid their obligations. (*Id.* at 26–28.)

Determining whether the Phase I report was "reasonably satisfactory" will require the resolution of disputed issues of fact. When a contract conditions one party's performance on that party's satisfaction, courts impose a duty of good faith and fair dealing that requires the party to exercise its discretion as would a reasonable person. *Misano di Navigazione, SpA v. United States,* 968 F.2d 273, 274–75 (2d Cir.1992). Thus, it is clear that SAC would not be free to reject the Phase I report based on the color of the paper on which it was printed, or for some other inconsequential reason. Rather, the question is whether a reasonably prudent buyer would have been sufficiently satisfied with the report to proceed with the transaction. *Id.* (citing Restatement (Second) of Contracts § 228 (1981)). To determine whether SAC's dissatisfaction was reasonable, therefore, the factfinder will have to ascertain the severity of the problems disclosed and consider them in light of the transaction as a whole. To this end, Recticel has proffered evidence that the issues involved were "plain vanilla" problems typical of any plant of Soundcoat's size and type (Walka Decl. ¶¶ 19–25), and that the parties agreed that Bay and SAC would not have to sustain the costs of remedying all of the environmental issues (Killeen Decl. Ex. 11; Jous Dep. at 68). Defendants dispute both of these assertions, arguing, in essence, that they believed that further investigation would reveal that the problems involved could be quite serious. (Roberts Aff. ¶¶ 5–6; Kleinschmidt Aff. of 2/3/03 ¶ 12; Defs. R. 56.1 Counter-statement ¶¶ 23, 29.) A reasonable factfinder could credit SAC's assertion that it did not consider the environmental problems minor, and conclude that it reasonably decided that a Phase II investigation would only uncover more problems, making Soundcoat more of a liability than an asset. On the other hand, a factfinder could also conclude that the nature of the problems, combined with Recticel's alleged promise to take responsibility for them, rendered SAC's dissatisfaction unreasonable. Thus, the question of SAC's reasonableness must be resolved at trial.

Recticel argues that, even if the Phase I report was not reasonably satisfactory, SAC waived any objections it had to the

report by "accepting" it and continuing to negotiate to close the transaction.[4] (Pls. Mem. at 25; Killeen Decl. ¶¶ 28–29.) Thus, since the parties had allegedly agreed to allow Recticel to remedy the environmental issues after closing, SAC could not then refuse to close by invoking § 7.1(f), because the parties had, in essence, agreed to modify the Agreement to remove the condition. This argument is unavailing. The Agreement contains a merger clause that provides that "[n]o amendment or modification of this Agreement shall be valid or binding ... unless same is made in writing and signed" (Kleinschmidt Aff. Ex. A § 11.6), which protected SAC's right to negotiate to modify the Agreement without becoming bound to a modification, absent a written and executed amendment. No such amendment was ever executed. (Defs. R. 56.1 Counter-statement ¶ 29.) Thus, SAC's negotiating potential solutions to the environmental problems did not result in the deletion from the Agreement of the condition precedent in § 7.1(f). *99 Realty Co. v. Eikenberry*, 242 A.D.2d 215, 660 N.Y.S.2d 583, 584 (1st Dep't 1997).

Recticel also argues that defendants cannot rely on this condition precedent to excuse their performance because defendants' own actions prevented the condition from occurring. (Pls. Mem. at 26–28.) Parties to a contract have an implied duty not to "do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract," and therefore may not rely on a condition precedent after having taken actions that contributed to its non-occurrence. *A.H.A. General Constr., Inc. v. New York City Housing Auth.*, 92 N.Y.2d 20, 31, 677 N.Y.S.2d 9, 699 N.E.2d 368 (1998) (internal quotation marks and citations omitted). Such actions will not constitute a breach of the party's duty of good faith, however, unless it has acted in a way that defeats the "reasonable expec-

---

**4.** While Recticel frames this argument in terms of SAC's alleged waiver of the right to insist upon the condition precedent (Pls. Reply at 5–6), the argument is more suitably grounded in a theory of contract modification. *See Christian Dior–New York v. Koret, Inc.*, 792 F.2d 34, 39–40 (2d Cir.1986). The Agreement provides a waiver clause in its condition precedent section, stating that "each of the following conditions ... may be waived by Buyer." (Kleinschmidt Aff. Ex. A § 7.1.) The waiver of conditions precedent contemplated by the Agreement would have to take place at the closing itself, however, since the Agreement provides that SAC's obligation to consummate the transaction was subject to the fulfillment, "on and as of the Closing date" (*id.* § 7.1(a)), of all of the conditions precedent. (*Id.* § 7.1.) Thus, SAC's duty to close would not have arisen until Recticel presented it with certification of the satisfaction of all of the conditions, which was to have happened at the closing. (*Id.*) *See Wheelabrator Techs. of North Am., Inc. v. Fin. Sec. Assurance of Okla., Inc.*, No. 88 Civ. 7623(LMM), 1990 WL 180552, at *2 (S.D.N.Y. Nov. 15, 1990) (holding that duty to perform does not arise until all conditions precedent have been fulfilled). Thus, since a waiver of a condition precedent is expressed by a party's indicating that it will perform, even though it has no duty to do so, SAC could not have waived any of the conditions precedent until the closing, when it would have found out whether or not it was obligated, by the satisfaction of the conditions, to close. Any agreement that SAC would not rely on the condition, made prior to closing, would actually be a modification of the Agreement, since it would expand SAC's obligation to close to circumstances under which SAC originally would not have had such an obligation. *See Nat'l Utility Serv., Inc. v. Whirlpool Corp.*, 325 F.2d 779, 781 (2d Cir.1963) ("A party ... cannot by waiver of a condition precedent to his own liability create an obligation in himself where none previously existed."). Therefore, Recticel's argument that SAC may have "waived" the condition precedent through its conduct of negotiations *prior* to closing, is actually an argument that the parties modified the Agreement to remove § 7.1(f), so that SAC's duty to close would have arisen even in the absence of a satisfactory Phase I report.

tations" held by the parties when they entered into the contract. *Cross & Cross Properties, Ltd. v. Everett Allied Co.*, 886 F.2d 497, 501–02 (2d Cir.1989). Thus, if the parties reasonably contemplated that "'interference' with the condition precedent" might occur, the party who frustrated the condition's occurrence will still be able to rely on the failure of the condition to avoid its obligations under the contract. *Id.* at 502.

Recticel claims that by agreeing to defer the remediation of Soundcoat's environmental problems until after closing (Killeen Decl. Ex. 9), defendants caused Recticel to postpone the production of a Phase II report and refrain from taking the steps necessary to remedy the problems, so that all of Soundcoat's problems were still extant at closing. (Pls. Mem. at 26.) Had it had the chance to remedy the problems before closing, Recticel contends, it could have produced a second Phase I report that would have been satisfactory, because it would have established that Soundcoat's environmental problems had been solved. (Pls. Reply at 3.) Defendants assert that they agreed to put off the environmental issues only until after the March 2 closing date, because the problems had been disclosed less than two weeks earlier, but that once the closing date was postponed until April, they made no assurances that could have prevented Recticel from remedying the problems and producing a new Phase I report in time for the closing. (Defs. R. 56.1 Counter-statement ¶ 30.) Recticel has presented evidence, however, that the parties continued to negotiate a solution to the environmental problems even after the March 2 closing date (Killeen Decl. Ex.

10), and that the proposed amendment to the Agreement contemplated that Recticel would retain ongoing responsibility for Soundcoat's environmental condition even after the closing (*id.* Ex. 11 ¶ 6), both of which could suggest a continuing agreement to leave the environmental remediation until after closing. Thus, the parties dispute the substance of their agreement to suspend the environmental issues pending closing, and the trier of fact will have to determine whether defendants represented that the environmental issues could be resolved after the April 2 closing, and whether that agreement prevented Recticel from producing a satisfactory Phase I report.

Even if defendants did agree that the environmental problems could be deferred until after closing, they may still be able to rely on the condition precedent, because it is possible that the parties contemplated "interference" with the condition in § 7.1(f) when they drafted the Agreement. *Cross & Cross*, 886 F.2d at 502. Because the Agreement provided that the Phase I report would have to be reasonably satisfactory to SAC, but did not provide any definition of what would constitute reasonable satisfaction, it is possible that the parties meant to leave open the possibility of negotiating solutions to any environmental problems that might be discovered. In that case, SAC may have had the right to attempt to negotiate a satisfactory means of remedying the problems, while remaining free to invoke the condition precedent if those negotiations did not yield results in time for the closing.[5]

---

**5.** While this result might seem harsh from Recticel's perspective, presumably Recticel could have negotiated for assurances from SAC that it would not invoke § 7.1(f) if negotiations were unsuccessful, or could have simply gone ahead with the environmental remediation. Its failure to protect itself in this way should not impact SAC's right to invoke § 7.1(f), if this possibility was contemplated by the parties when they drafted the Agreement.

### 2. *Truth of Recticel's Representations and Warranties*

Defendants also rely on § 7.1(a) of the Agreement, which provided that "[t]he representations and warranties of Seller ... shall be true and correct in all material respects" before SAC's duty to close would arise (Kleinschmidt Aff. Ex. A § 7.1(a)), in arguing that they are not liable for refusing to consummate the transaction. Specifically, defendants contend that the problems revealed by the Phase I report caused three of Recticel's representations and warranties to be untrue at the time of closing.

First, defendants assert that the need to retain a consultant to produce a Phase II report to further explore Soundcoat's environmental problems, at a cost of $40,000, constituted an undisclosed liability "that ... would ... be reasonably likely to have a Material Adverse Effect," contrary to Recticel's representation that no such liabilities existed. (*Id.* § 4.8; Defs. Mem. at 13.) At the outset, the parties dispute the contractual meaning of "material adverse effect." The Agreement provided a two-pronged definition of "material adverse effect": for the purposes of determining whether a party was obligated to close, materiality was to be judged in light of the size of the transaction and other conditions (a determination that, according to plaintiffs, usually yields a figure of roughly 10% of the purchase price (Pls. Mem. at 28–29)), and for the purposes of determining whether "[Recticel] ha[d] breached any of its representations and warranties," the materiality threshold

would be $5000. (Kleinschmidt Aff. Ex. A § 1.) Thus, plaintiffs argue, when the truth of a representation is considered in order to determine whether SAC had a duty to close under § 7.1(a), a material adverse effect would be a liability of roughly $1.2 million (10% of the transaction size), but when considered in light of a damages action for breach based on the untruth of Recticel's representations and warranties, a liability of $5000 be material, causing the representations of § 4.8 to be untrue. (Pls. Mem. at 28–29; Wiseman Decl. ¶¶ 21–25.) Defendants argue that an undisclosed liability of $5000 would cause the representations to be untrue no matter what the context, thus preventing the condition precedent of § 7.1(a) from being satisfied, and allowing SAC to avoid the transaction.[6] (Defs. Mem. at 13.) While plaintiffs' reading is somewhat labored—it requires defining a material adverse effect in the context of representation § 4.8 to be one amount when considered in conjunction with the condition precedent in § 7.1(a), and another amount when considered on its own, in the context of an action for breach—the contrary interpretation, that SAC could avoid the $11.7 million transaction on the basis of an undisclosed liability of $5000, seems somewhat implausible. Because the parties have advanced two possible readings of the contract, neither of which is clearly in error, the Agreement's definition of a material adverse effect in the context of the conditions precedent is ambiguous, and the trier of fact will have to resolve questions of fact as to the parties' intent in drafting the Agreement.[7] *Bourne,* 68 F.3d at 629 (cita-

---

**6.** Defendants' interpretation is supported by the fact that the conditions precedent section does contain an independent reference to a material adverse effect in one of the conditions, which could suggest that the more indeterminate materiality definition was intended

to apply to this condition. (Kleinschmidt Aff. Ex. A § 7.1(e).)

**7.** To this end, Recticel has proffered the testimony of Stephen Wiseman, one of the attorneys who negotiated the Agreement for Recticel, in which he states that the parties

tions omitted) (holding that where contract is capable of more than one meaning, interpretation is a question of fact for trial).

If plaintiffs are correct in their interpretation of the definition of materiality, the $40,000 cost of the Phase II report did not automatically constitute a material adverse effect, and material issues of fact exist as to whether the need for the Phase II investigation, when considered in light of the transaction as a whole and the nature of the environmental issues involved, constituted a material adverse effect that caused the representations in § 4.8 to be untrue. *LaSalle Bank Nat'l Ass'n v. Citicorp Real Estate, Inc.*, No. 01 Civ. 4389(AGS), 2002 WL 181703, at *5–6 n. 5 (S.D.N.Y. Feb. 5, 2002) (noting that determinations as to whether an event is a material adverse effect are fact-specific). On the other hand, even if defendants are correct that a liability of $40,000 is a material adverse effect, it is not clear that this would have been a liability on Soundcoat's part, since Recticel alleges that it agreed to undertake all costs relating to the environmental problems. (Killeen Decl. ¶ 11.)

Second, defendants assert that the representation in § 4.21(c), that "[t]o the knowledge of Seller, there are no material Environmental, Health, and Safety Liabilities with respect to the Facilities or the Company," was untrue at the time of closing. (Kleinschmidt Aff. § 4.21(c).) "Liabilities" is defined as "any cost . . . obligation or other responsibility arising . . . under Environmental Laws." (*Id.* § 1.) Determination of this issue necessarily involves factual questions, such as whether the problems revealed by the Phase I report were material, *Lasalle Bank*, 2002

WL 181703, at *5, and whether, if Recticel did agree to assume complete responsibility for environmental remediation, Soundcoat's environmental problems could be considered liabilities on its part.

Third, defendants argue that the representation in § 4.21(e), that there was no reasonable basis to expect that Soundcoat would incur any "material costs related to remediation of Hazardous Materials at any Facility," was also untrue at the time of closing. (Kleinschmidt Aff. Ex. A § 4.21(e).) Again, issues of fact must be resolved with respect to whether the Phase I report revealed a reasonable basis to believe that Soundcoat had hazardous material problems, whether related costs would be material, and whether Recticel's alleged agreement to undertake remediation costs should have negated any basis for expecting that Soundcoat itself would have to incur those costs.

### C. *Defendants' Duty of Good Faith*

Recticel also argues that, even if the conditions precedent were not fulfilled and SAC had no duty to close, SAC breached its duty of good faith and fair dealing under both the Agreement and New York law. Under the Agreement, both parties had a duty to "use . . . reasonable best efforts and act in good faith to cause to be satisfied . . . all conditions to Closing and to cause the transactions contemplated by this Agreement to be consummated." (Kleinschmidt Aff. Ex. A § 6.2.) This duty is independent of the parties' duty to close, as it inheres in the negotiations leading up to closing, and thus SAC could be liable for breaching its contractual duty of good faith

intended to define a material adverse effect in accordance with Recticel's interpretation. (Wiseman Decl. ¶¶ 20–28.) This extrinsic evidence is admissible because the contract is ambiguous, but it is for the trier of fact to determine whether or not it is credible.

*Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992) (stating that resolution of parties' intent in drafting, when the contract is ambiguous, is inappropriate on summary judgment).

even if Recticel did not satisfy the conditions precedent.

 New York law implies a covenant of good faith and fair dealing into every contract, requiring that parties not "frustrate the contracts into which they have entered." *Grad v. Roberts*, 14 N.Y.2d 70, 75, 248 N.Y.S.2d 633, 198 N.E.2d 26 (1964). To breach the implied covenant, the party must act in a way that is inconsistent with the justified expectations of the other party, or act for reasons other than the ones it discloses. *Mickle v. Christie's, Inc.*, 207 F.Supp.2d 237, 252 (S.D.N.Y.2002). Thus, under both the Agreement and New York law, SAC would be liable for acting in bad faith if it did not intend for its negotiations to result in the closing, or if it purposely acted in a manner that prevented the closing from occurring.

Recticel alleges that defendants decided that the stock purchase was no longer advantageous to them after the profits of both Soundcoat and Bay fell in February 2001 (Pls. Mem. at 13), and that defendants then proffered a variety of pretextual issues as grounds on which they could avoid their duty to close. It is undisputed that, towards the end of March, despite the parties' having renegotiated Soundcoat's purchase price based on the downturn in its profits, defendants determined that the purchase would violate all of Bay's "threshold criteria for evaluating an acquisition" (Pls. Mem. at 13; Killeen Decl. ¶¶ 36–37 & Ex. 27), because its projected cash flows for the next eight years were negative, and it had a lower goodwill figure than Bay usually found acceptable. (Lewis Dep. at 23–24.) By March 23, defendants had decided not to consummate the transaction, although they continued to represent to Recticel that they would be attending the closing. (Kleinschmidt Dep. at 229–32.) On March 27, Bay's counsel sent Recticel a letter indicating that SAC felt that it could not close because of problems with the landlords of both facilities. (Wiseman Decl. Ex. 13.) After Recticel indicated that it believed these issues had been resolved, SAC based its refusal to close in part on the allegedly unsatisfactory Phase I report and the possibility that the Deer Park facility had serious environmental problems. (*Id.* Ex. 15.) Thus, SAC's view of the environmental problems had clearly changed since it first found out about them, as SAC had initially agreed that remediation could be deferred until after the original March 2 closing date. (Defs. R. 56.1 Counter-statement ¶ 30.) Thus, a reasonable factfinder could conclude that, when the results of the Phase I investigation were first disclosed, SAC did not view the problems as severe enough to cause it to reevaluate the transaction, and that its reliance on the report to avoid the transaction just a few days before the scheduled closing suggests pretext rather than a good-faith belief in the gravity of the environmental problems. If SAC cited the environmental problems simply to avoid the deal, it would have violated its duty of good faith both under the Agreement (Kleinschmidt Aff. Ex. A § 6.2) and New York law, *Mickle*, 207 F.Supp.2d at 252 (describing use of pretextual reasons as bad faith).

Alternatively, a factfinder could conclude that the ongoing negotiations surrounding the environmental remediation revealed the gravity of the problems and the difficulties involved in fixing them, and that SAC in good faith began to believe that the problems were more severe than first imagined. Despite having attempted to negotiate a solution to the problems in good faith, SAC could have concluded that the fact that issues remained unresolved so close to the closing date necessitated that it reconsider the transaction and its obli-

gations under the Agreement. Because the undisputed facts allow more than one reasonable inference as to SAC's intent with respect to the closing, whether or not it breached its duty of good faith is a question for the factfinder at trial.

■ In short, neither party is entitled to summary judgment on its claims of liability under the Agreement. Genuine issues of fact exist as to whether Recticel had fulfilled the conditions precedent, giving rise to SAC's duty to consummate the transaction. Even if Recticel failed to fulfill the conditions, it has presented evidence from which a reasonable factfinder could conclude that SAC determined that the purchase was no longer in its interest, and used the Phase I report as an excuse to avoid the transaction, in violation of its duty of good faith and fair dealing. Thus, contrary to defendants' assertions (Defs. Mem. at 4), liability under the Agreement does not turn solely on the language of the Agreement, as that language is often capable of more than one meaning, and determining the contractual significance of the events that formed the subjects of the parties' negotiations requires consideration of the intent of the parties and their respective understandings of the negotiations. Resolving these issues will require credibility determinations and inferences that must be made by the trier of fact.

### D. *Bay's Liability Under the Agreement*

■ Defendants argue that they are entitled to summary judgment with respect to Bay's liability under the Agreement, because only SAC was a party to the

contract. (Defs. Mem. at 13; Kleinschmidt Aff. Ex. A § 1.) While conceding that Bay is not a party to the contract, plaintiffs present a variety of theories that they contend allow them to hold Bay liable (Pls. Mem. at 30–44), all of which rely on the principles of corporate veil-piercing to reach Bay as the affiliate, or controller, of SAC. Plaintiffs' most persuasive theory of Bay's liability is that Bay has manifested an intent to be bound by the contract by (1) negotiating the Agreement and (2) by maintaining SAC as a shell corporation whose sole purpose was to be a party to the Agreement. "A parent corporation may become a party to its subsidiary's contract if the parent's conduct manifests an intent to be bound by the contract.... A parent corporation that negotiates a contract but has a subsidiary sign it can be held liable as a party to the contract, if the subsidiary is a dummy for the parent corporation." *Warnaco Inc. v. VF Corp.*, 844 F.Supp. 940, 946 (S.D.N.Y.1994) (internal citations omitted). Since determining Bay's intent with respect to whether it was bound by the Agreement, and the parties' understanding of that intent, requires inferences and credibility determinations, neither party is entitled to summary judgment on this issue.

A reasonable factfinder could conclude that SAC existed purely as a shell corporation under Bay's control. SAC was created "at Bay's direction" solely as an acquisition vehicle for Soundcoat's stock. (Defs. R. 56.1 Counter-statement ¶ 7.) Both Bay and SAC are wholly owned by AWS/gb, and Arnold and Gloria Schmidt are the sole directors and officers of all three corporations.[8] (*Id.* ¶ 8.) SAC has no place of

---

8. Bay is not technically SAC's parent corporation, since it does not have an ownership stake in SAC. (Defs. Mem. at 15 n. 3.) This does not affect the analysis here, however, since the two corporations are part of the same close-knit corporate structure. In addi-

tion, for purposes of Bay's liability, the operative question is not stock control, but whether Bay in practice exercised such control over SAC that it should be liable for SAC's acts. *Townley v. Emerson Electric Co.*, 178 Misc.2d 740, 681 N.Y.S.2d 741, 743 (1998) (holding

business, employees, or agents, and was represented at all times by Bay's employees. (*Id.* ¶ 12.) Because it does not maintain an independent bank account, or have its own debts or assets (Marzulla Decl. Ex. 4 at 2; Defs. R. 56.1 Statement ¶ 12), the funds necessary to purchase Soundcoat's stock were to come from Bay. (Defs. R. 56.1 Counter-statement ¶ 15.) Thus, a factfinder could conclude that SAC has never had an existence independent of Bay, and that Bay so dominated SAC that the two "should be considered one and the same organization." *Townley v. Emerson Electric Co.*, 178 Misc.2d 740, 681 N.Y.S.2d 741, 744 (1998).

It is also possible to conclude that Bay manifested an intent to be bound by a contract through its control of the contract negotiations. *Oy Noresin AB v. ICC Industries, Inc.*, No. 91 Civ. 1748(MBM), 1991 WL 161367, at *1 (S.D.N.Y. Aug. 16, 1991). Bay's negotiators had complete responsibility for the negotiations, and SAC was not even created as a corporate entity until after Agreement was drafted. (Defs. R. 56.1 Counter-statement ¶¶ 4, 6–7.) While defendants argue that, after SAC's creation, the negotiators began to negotiate on behalf of SAC rather than Bay (Roberts Aff. ¶ 3), this argument is not conclusive, and may simply underscore the fact that SAC was a shell corporation. SAC never had its own negotiators or employees, and the fact that Bay's negotiators may have subjectively viewed themselves as negotiating for SAC, after its creation, cannot negate the fact that these negotiators were at all times employees of Bay, not SAC, and that SAC had no separate corporate leadership from which the negotiators could have received directions. Thus, Recticel has presented evidence that Bay had control of the negotiations at all times, and therefore intended to be bound under the Agreement. On the other hand, Bay asserts that it did not intend to be bound, as evidenced by the fact that it did not insert its name into the Agreement.[9] (Defs. Mem. at 14.) Because questions of a party's intent are ultimately questions of fact, requiring credibility determinations and inferences, whether Bay intended to be bound by the Agreement is a factual issue that must be resolved at trial.

Defendants argue that Bay cannot be held liable for SAC's potential breach of the Agreement absent some showing of fraud or wrongdoing. (Defs. Mem. at 15.) As Recticel concedes that its negotiators were informed of Bay's intent to use an acquisition vehicle, and did not object at the time (Jous Dep. at 69–70; Pls. Mem. at 5), Bay has clearly not acted fraudulently with respect to SAC's role in the transaction. No proof of fraud is necessary, however, when piercing the corporate veil will result in the liability of another corporation, rather than an individual. *Van Valkenburgh, Nooger & Neville v. Hayden*

---

that stock control and interlocking directors are not in themselves sufficient to establish parent's liability, and requiring actual control over the subsidiary's operations).

9. Defendants argue that Recticel may not now seek to hold Bay liable under the Agreement, because of its awareness that SAC, not Bay, would be a party to the Agreement, and its failure to negotiate to have Bay included as a party. (Defs. Mem. at 14.) While it may be somewhat surprising that Recticel's negotiators failed to insist that Bay be included in the Agreement, or that it provide some sort of security against any potential breach by SAC, these factors would not negate any intent on Bay's part to be bound under the Agreement. In addition, Recticel has presented evidence suggesting that its failure to object to the arrangement stemmed from its understanding that Bay was the "true" purchaser (*see, e.g.*, Jous Decl. ¶¶ 3–4; Killeen Decl. ¶ 44), and such an understanding would be relevant to whether the parties agreed, or assumed, that Bay would be bound.

*Publishing Co.,* 30 N.Y.2d 34, 42, 330 N.Y.S.2d 329, 281 N.E.2d 142 (1972); *Townley,* 681 N.Y.S.2d at 744–45. Therefore, plaintiffs have presented sufficient evidence from which a factfinder could conclude that Bay should be liable for any breach committed by SAC, and neither side is entitled to summary judgment on Bay's liability.

## IV. *The Parties' Discovery Dispute*

Defendants seek production of the complete "Environmental Compliance Program and Phase II Environmental Site Assessment, Compendium of Environmental Documents" (the "Compendium"), which, among other things, contains the findings of the detailed environmental investigation that was performed on Soundcoat's Deer Park facility after the SAC transaction fell through. The Phase II investigation was instituted after SAC refused to close on April 2, 2001, in order to examine and resolve the environmental problems first revealed in the Phase I report. (Jt. Ltr. of January 28, 2003, at 3.) The Phase II assessment, performed by Richard Walka of the environmental firm Dvirka & Bartilucci, was a comprehensive environmental investigation that examined a number of compliance issues, most of which had been raised in the Phase I report. (*Id.*) Soundcoat created the Compendium to document both the results of the Phase I and Phase II investigations and the remediation measures that it undertook to bring both of its facilities into full compliance with environmental laws. (Compendium, Introduction at 1–3.)

During discovery, plaintiffs produced the portions of the Compendium that related to the issues raised by the Phase I report. (Jt. Ltr. of January 27, 2003, at 3.) Defendants now seek the production of remaining portions of the Compendium, which plaintiffs have refused to produce on

grounds of relevance and attorney-client privilege. (*Id.* at 4–5.) By agreement of the parties, to avoid additional motion practice, plaintiffs provided the Compendium to the Court for in camera review.

The withheld portions of the Compendium are not relevant to the issues in this case. Fed.R.Civ.P. 26(b)(1) provides that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party.…" Fed.R.Civ.P. 26(b)(1). Thus, it is not sufficient that the material sought be relevant to the general subject matter of the action, if it does not relate to the specific claims or defenses of either party. *Johnson Matthey, Inc. v. Research Corp.,* No. 01 Civ. 8115(MBM)(FM), 2002 WL 31235717, at *2 (S.D.N.Y. Oct. 3, 2002) (contrasting current Rule 26(b)(1) with the earlier, broader test for relevance). In order to obtain discovery of material that relates to the subject matter of the action, a party must show good cause. *Id;* Fed.R.Civ.P. 26(b)(1).

Whether defendants are liable for breaching the Agreement, or whether their affirmative defense of failure of conditions precedent is valid, turns on the contractual significance of the parties' knowledge of Soundcoat's environmental issues as of February and March 2001. As the above discussion of the parties' summary judgment motions indicates, adjudicating liability will involve examining what environmental issues were known to both parties at the time of the transaction, how serious those issues were, whether they made the Phase I report unsatisfactory, and whether they created a reasonable expectation of material liabilities. Thus, even a devastating environmental problem, extant at the time of the transaction but unknown to both parties during negotiations, would not form the basis of a defense to defendants' liability, because all of the conditions on

which defendants rely are dependent on their knowledge and any reasonable inferences arising from that knowledge. (*See, e.g.,* Kleinschmidt Aff. Ex. A §§ 4.21(e), 7.1(f).)

 The withheld portions of the Compendium relate to environmental issues that were discovered and remedied after the transaction fell through, as well as the post-transaction remediation of issues raised in the Phase I report. This documentation is simply not relevant to the parties' knowledge at the time of the transaction, or the reasonableness of their beliefs as to the seriousness of the problems.[10] While the additional materials in the Compendium certainly relate to the general subject matter of this action, defendants have not demonstrated good cause for compelling production of the material, as they have not made any showing of need.[11] Because plaintiffs have produced all parts of the Compendium that pertain to environmental problems and remediation that took place prior to SAC's refusal to consummate the transaction, there is no need for them to produce any additional portions of the Compendium.

### CONCLUSION

For the reasons set forth above, the cross-motions for summary judgment are denied. Defendants' motion to strike various portions of the declarations submitted in support of plaintiffs' summary judgment motion is denied. Defendants' request

that plaintiffs be directed to produce additional portions of the Compendium not already produced is denied.

In accordance with the Court's Individual Practices in Civil Cases, a joint pretrial order is due within 30 days of the filing of this opinion, unless the parties notify chambers within that period that they agree that the case should be referred for mediation or for a settlement conference before a magistrate judge.

SO ORDERED.

---

10. The one relevant document not produced is a copy of the Phase I report, which defendants already possess, since the Phase I report was provided to both sides during the transaction.

11. Defendants assert that they are entitled to the Compendium because it is an expert report within the meaning of Rule 26(a)(2). (Jt. Ltr. of January 28, 2003, at 1–2.) Even assuming that portions of the Compendium constitute an expert report because the author of the Phase II report, Richard Walka, may be an expert witness at trial, defendants are still not entitled to the portions of the Compendium that they have not already received. Because the redacted portions are not relevant to either party's case, there is no reason for plaintiffs to offer testimony, expert or otherwise, about the issues raised in the redacted portions.