# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| YATRA ONLINE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **C.A. No. 2020-0444-JRS** |
| | ) | |
| EBIX, INC., EBIXCASH TRAVELS, INC., | ) | |
| REGIONS BANK, BMO HARRIS BANK N.A., | ) | |
| BBVA USA, FIFTH THIRD BANK, | ) | |
| NATIONAL ASSOCIATION, KEYBANK | ) | |
| NATIONAL ASSOCIATION, SILICON | ) | |
| VALLEY BANK, CADENCE BANK, N.A., | ) | |
| and TRUSTMARK NATIONAL BANK, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  May 17, 2021
Date Decided:  August 30, 2021

Gregory V. Varallo, Esquire of Bernstein Litowitz Berger & Grossmann LLP, Wilmington, Delaware and Mark Lebovitch, Esquire and Daniel E. Meyer, Esquire of Bernstein Litowitz Berger & Grossmann LLP, New York, New York, Attorneys for Plaintiff Yatra Online, Inc., as to all Defendants Except Fifth Third Bank, N.A.

Alisa E. Moen, Esquire of Moen Law LLC, Wilmington, Delaware, Of Counsel and Conflicts Counsel for Plaintiff Yatra Online, Inc. as to Fifth Third Bank, N.A.

Paul J. Lockwood, Esquire, Cliff C. Gardner, Esquire and Elisa M.C. Klein, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware, Attorneys for Defendants Ebix, Inc. and EbixCash Travels, Inc.

Tammy L. Mercer, Esquire and Lakshmi A. Muthu, Esquire of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Robert A. Muckenfuss, Esquire and Kelly A. Warlich, Esquire of McGuireWoods LLP, Charlotte, North Carolina; and Kayla J. Marshall, Esquire of McGuireWoods LLP, Washington, DC, Attorneys for Defendants Regions Bank, BMO Harris Bank, N.A., BBVA USA, KeyBank National Association, Silicon Valley Bank, Cadence Bank, N.A., and Trustmark National Bank.

Michael D. DeBaecke, Esquire and F. Troupe Mickler IV, Esquire of Ashby & Geddes, P.A., Wilmington, Delaware and Victor A. Walton, Jr., Esquire, Eric W. Richardson, Esquire and David F. Hine, Esquire of Vorys, Sater, Seymour and Pease LLP, Cincinnati, Ohio, Attorneys for Defendant Fifth Third Bank, National Association.

**SLIGHTS, Vice Chancellor**

This case concerns an abandoned merger (the "Merger") that Plaintiff, Yatra Online Inc. ("Yatra"), asserts was sabotaged post-signing by Defendants, Ebix, Inc. ("Parent") and EbixCash Travels, Inc. ("Merger Sub" and, together with Parent, "Ebix"), after Parent determined the deal was no longer attractive. In early 2019, Parent and Yatra engaged in extensive negotiations regarding Parent's potential acquisition of Yatra. The parties ultimately agreed to structure the transaction as a stock-for-stock reverse triangular merger with Parent forming an acquisition subsidiary, Merger Sub, to merge with and into Yatra, leaving Yatra as both the surviving entity and a direct, wholly owned subsidiary of Parent. The merger agreement (the "Merger Agreement") was duly executed by Ebix and Yatra on July 16, 2019 (the "Signing Date"), but the closing never occurred.

According to the Merger Agreement, at closing (the "Closing"), each share of Yatra stock would be converted into the right to receive shares of Parent's convertible preferred stock (the "Convertible Preferred Stock") per a fixed exchange ratio. The rights associated with the Convertible Preferred Stock included a put right (the "Put Right"), which could be exercised during the 25th month after the Closing. The Put Right gave former Yatra stockholders the option to force Parent to redeem any unconverted shares of Convertible Preferred Stock for $5.31 per share. This was a key feature of the deal, in part, because it gave Yatra stockholders a floor under which the price for their shares could not fall.

1

The Convertible Preferred Stock was to be issued for the first time in connection with the Merger and, thus, had not been registered with the Securities Exchange Commission ("SEC") as of the Signing Date. To register the security, Parent needed to file, and the SEC needed to accept and approve, a Form S-4 registration statement. As a right attached to the Convertible Preferred Stock, the Put Right could not be exercised until the Convertible Preferred Stock was registered.

Parent's S-4 filing was delayed for months after the Signing Date notwithstanding Parent's contractual promise to move forward on that front as promptly as practicable. Making matters worse, the COVID-19 pandemic depressed Parent's stock price, ballooning the value of the Put Right relative to Parent's market capitalization. According to Yatra's amended complaint (the "Complaint"), it was then that Parent's view of the deal soured, and it wanted out.[1]

To buy time as it planned its exit, Parent sought to renegotiate several deal points post-signing and repeatedly extended the outside date contemplated in the Merger Agreement. Relevant here, one of those extensions came in the form of a letter agreement (the "Extension Agreement"), where Ebix explicitly promised, among other things, that it would negotiate with Yatra in good faith. Having anchored Yatra at bay in the dark, Parent and its lenders (the "Lender Defendants"—

---

[1] Pl.'s Verified Am. Compl. (D.I. 27) ("Compl.").

further defined below) secretly negotiated an amendment (the "Tenth Amendment") to Yatra's credit agreement (together with the amendments, the "Credit Agreement") that effectively eliminated Parent's ability to issue the Put Right without causing Parent to default under the Credit Agreement.

Fed up with Parent's behavior during the extended renegotiations, and after the final outside closing date lapsed, Yatra terminated the Merger Agreement and filed a lawsuit against Ebix in this court on June 5, 2020. Yatra's original complaint (the "Original Complaint") asserted two counts against Ebix: Count I claimed a breach of the Merger Agreement, while Count II claimed a breach of the Extension Agreement.[2] In its initial motion to dismiss, Ebix argued that Yatra's termination triggered the Merger Agreement's Effect of Termination provision (the "Effect of Termination Provision"), which eliminated Ebix's liability for all claims post-termination except fraud. In response, Yatra amended its Original Complaint to assert fraud and breach of the implied covenant of good faith and fair dealing against Ebix—in addition to the two breaches of contract claims alleged in the Original Complaint. Yatra also added a claim against the Lender Defendants for tortious

---

[2] *See generally* Pl.'s Verified Compl. for Breach of Contract (D.I. 1).

3

interference with Yatra's Put Right.[3] All Defendants have moved to dismiss the Complaint under Chancery Rule 12(b)(6).

For reasons explained below, Defendants' motions must be granted in full. Under the Merger Agreement's plain terms, Yatra extinguished its breach of contract claims when it elected to terminate the Merger Agreement. The implied covenant claim fails because there is no gap in the Merger Agreement for the implied covenant to fill. And the fraud and tortious interference claims fail because each relies on the false premise that the Tenth Amendment frustrated Yatra's remedy for specific performance. As Yatra affirmatively pleads, it could not have sued for specific performance until the S-4 filing was approved, and it elected to terminate the Merger Agreement before that condition to closing occurred. Consequently, Yatra has failed to plead reasonably conceivable loss causation for either fraud or tortious interference. My reasoning follows.

---

[3] (D.I. 27).

# I. BACKGROUND

The facts are drawn from the pleadings, documents incorporated into the pleadings by reference and matters of which the Court may take judicial notice.[4]

## A. The Parties

Plaintiff, Yatra, is a Cayman Islands exempted company with operations primarily in India.[5] It operates in the online travel space servicing both leisure and business travelers.[6] Yatra's common stock (or "ordinary shares") are listed on the NASDAQ exchange under the symbol "YTRA," and certain warrants to purchase its ordinary shares are listed on the OTCQX Best Market under the symbol "YTROF."[7]

Defendant, Parent, is a Delaware corporation with headquarters in Johns Creek, Georgia.[8] It operates as an international supplier of on-demand

---

[4] *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 612–13 (Del. 1996).

[5] Compl. ¶ 22.

[6] *Id.*

[7] *Id.*

[8] Compl. ¶ 23.

infrastructure exchanges to the insurance, financial and healthcare industries.[9] Parent's common stock is listed on NASDAQ under the symbol "EBIX."[10]

Defendant, Merger Sub, is a Cayman Islands exempted company and a direct, wholly owned subsidiary of Parent.[11] Merger Sub was formed solely to engage in the transactions contemplated by the Merger Agreement.[12]

Defendant, Regions Bank ("RB"), is an Alabama state-chartered commercial bank.[13] RB serves as administrative agent and collateral agent under the Credit Agreement and has served in such capacities since August 5, 2014.[14] RB is also a lender under the Credit Agreement and executed the Tenth Amendment.[15]

---

[9] *Id.*

[10] *Id.*

[11] Compl. ¶ 24.

[12] Ebix Defs.' Opening Br. in Supp. of their Mot. to Dismiss the Verified Am. Compl. (D.I. 53) ("DOB"), Ex. A (Merger Agreement, dated July 16, 2019, by and among Ebix and Yatra) ("MA"); MA § 4.9.

[13] Compl. ¶¶ 25, 119.

[14] Compl. at 2.

[15] Compl. ¶ 25.

Defendant, BMO Harris Bank N.A. ("BMO"), is a bank based in Chicago, Illinois.[16]  BMO is a lender under the Credit Agreement and executed the Tenth Amendment.[17]

Defendant, BBVA USA, is an Alabama banking corporation headquartered in Birmingham, Alabama.[18]  BBVA USA is a lender under the Credit Agreement and executed the Tenth Amendment.[19]

Defendant, Fifth Third Bank, National Association ("FTBNA"), is a national bank based in Cincinnati, Ohio.[20]  FTBNA is a lender under the Credit Agreement and executed the Tenth Amendment.[21]

Defendant, KeyBank National Association ("KNA"), is a regional bank headquartered in Cleveland, Ohio.[22]  KNA is a lender under the Credit Agreement and executed the Tenth Amendment.[23]

---

[16] Compl. ¶ 26.

[17] *Id.*

[18] Compl. ¶ 27.

[19] *Id.*

[20] Compl. ¶ 28.

[21] *Id.*

[22] Compl. ¶ 29.

[23] *Id.*

Defendant, Silicon Valley Bank ("SVB"), is a California state-charted bank.[24] SVB is a lender under the Credit Agreement and executed the Tenth Amendment.[25]

Defendant, Cadence Bank, N.A. ("CB"), is a national banking association. It is a lender under the Credit Agreement and executed the Tenth Amendment.[26]

Defendant, Trustmark National Bank ("TNB" and, together with CB, SVB, KNA, FTBNA, BBVA USA, BMO and RB, the "Lender Defendants"), is a Mississippi state-chartered bank headquartered in Jackson, Mississippi.[27] TNB is a lender under the Credit Agreement and executed the Tenth Amendment.[28]

## B. Yatra and Ebix Negotiate and Execute the Merger Agreement

On February 13, 2019, the CEO of Parent, Robin Raina, advised the CEO of Yatra, Dhruv Shringi, that Parent was interested in exploring a strategic transaction with Yatra.[29] Over the next two weeks, Shringi and Raina discussed potential

---

[24] Compl. ¶ 30.

[25] *Id.*

[26] Compl. ¶ 31.

[27] Compl. ¶ 32.

[28] *Id.*

[29] Compl. ¶ 33.

transaction structures, the details of which Shringi brought back to Yatra's senior management and Yatra's board of directors.[30]

On February 24, 2019, Parent sent a written proposal to Yatra's board of directors to acquire 100% of Yatra via a merger (the "Initial Proposal").[31] The Initial Proposal contemplated that the merger consideration would be payable either in cash or freely-tradeable Parent stock (with a price floor). All outstanding Yatra warrants would be surrendered (or repurchased) and retired by Yatra before closing.[32] If the merger consideration was stock, the Initial Proposal also provided for a put right that would be exercisable 25 months after closing and would allow former Yatra stockholders to sell the Parent stock they received as merger consideration back to Parent at 90% of the price at which it was issued.[33] Yatra's board of directors engaged sophisticated legal and financial advisors to assist in its evaluation of the proposed transaction.[34]

---

[30] Compl. ¶¶ 33–34.

[31] Compl. ¶ 34.

[32] *Id.*

[33] *Id.*

[34] Compl. ¶ 35.

On March 11, 2019, without consent from Yatra, Parent publicly disclosed the terms of the Initial Proposal in a press release and Form 8-K filed with the SEC.[35] Later that day, Yatra publicly confirmed that it was exploring a transaction with Parent, and the parties subsequently entered into a confidentiality agreement to protect against future unauthorized disclosures.[36]

Over the next several months, Yatra and Parent negotiated the Merger Agreement's terms and conducted mutual due diligence aided by legal and financial advisors.[37] Though Yatra engaged in preliminary discussions with two other potential strategic acquirors, Yatra and Ebix ultimately finalized and executed the Merger Agreement on July 16, 2019, announcing the Merger the next day.[38]

## C. The Merger Agreement

The Merger Agreement contemplated a stock-for-stock transaction where, upon Closing, each share of Yatra Stock would be cancelled and converted into a right to receive shares of Convertible Preferred Stock, in accordance with a fixed exchange ratio (with a different exchange ratio assigned to each class of

---

[35] Compl. ¶ 36.

[36] *Id.*

[37] Compl. ¶ 38.

[38] Compl. ¶ 39.

Yatra stock).[39] The rights associated with the Convertible Preferred Stock included the Put Right, which could be exercised during the 25th month after the Closing. The Put Right gave former Yatra stockholders the option to force Parent to redeem any unconverted shares of Convertible Preferred Stock for $5.31 per share.[40] On the Signing Date, the Put Right implied a Yatra equity value of $257 million, equaling approximately 17.5% of the Parent's market capitalization.[41] The Merger Agreement also contemplated that Parent would also assume certain outstanding Yatra warrants, which would be convertible into the same Convertible Preferred Stock per a specified exchange ratio and tempered by the same Put Right.[42]

Beyond the economic terms, the Merger Agreement included a number of representations and warranties offered by both Yatra and Ebix, as well as post-

---

[39] Compl. ¶ 40.

[40] *Id.*

[41] Compl. ¶ 41. The relative value of the Put Right to Parent's market capitalization would fluctuate, however, according to Parent's stock price. For example, on November 14, 2019, as Parent's stock price fell in the wake of a disappointing earnings announcement, the value of the Put Right equaled approximately 25.67% of Parent's market capitalization. *Id.* As of May 1, 2020, the last trading day before Parent proposed the "Heads of Terms" (described *infra*), the Put Right equaled approximately 44.17% of Parent's market capitalization. *Id.*

[42] Compl. ¶ 42.

signing, pre-Closing covenants, which were tied to closing conditions for the Merger.[43] Several of these provisions are relevant here.

*First*, Parent represented and warranted in Section 4.8 that all prior and future public disclosures complied or would comply with all SEC rules and regulations and federal securities laws (collectively, the "Accuracy Rep").[44]

*Second*, and relatedly, Parent represented and warranted in Section 4.10 that: (a) all prior and future financial statements complied or would comply with applicable accounting requirements, and (b) it had not received regulatory inquiries into its accounting practices or policies between December 31, 2018, and the date of the Merger Agreement (collectively, the "Accounting Reps").[45]

*Third*, Parent agreed to file the S-4 with the SEC as "promptly as practicable" and in no event later than 45 days after the Signing Date (i.e., August 30, 2019).[46] Parent also agreed to use "reasonable best efforts" to have the SEC declare the S-4 effective "as promptly as practicable after such filing with the SEC" (the "S-4

---

[43] Compl. ¶ 43.

[44] Compl. ¶ 44; MA §§ 4.8(b)–(c).

[45] Compl. ¶ 46; MA §§ 4.10(a)–(b).

[46] Compl. ¶ 56; MA § 6.1(a).

Covenants").[47]   An effective S-4 was a closing condition to the Merger and a prerequisite for Yatra to hold its stockholder meeting for approval of the Merger.[48]

*Fourth*, Parent and Yatra agreed to use "reasonable best efforts" to ensure that all closing conditions would be satisfied (the "Best Efforts Covenant").[49]

*Fifth*, the Merger Agreement did not require that the Closing occur on a specific calendar date.  Rather, it provided that the Closing would take place on the third business day following the date on which each of the closing conditions set forth in Article VII is satisfied or waived by the party entitled to waive such condition, *provided* that the Closing must occur before the outside closing date of April 12, 2020 (the "Outside Date").[50]

*Finally*, if the Closing did not occur before the Outside Date, then either party could terminate the Merger Agreement.[51]  This termination right did not apply if the terminating party had breached or violated any of its obligations under the Merger Agreement and "such breach [was] the principal cause of or directly resulted in

---

[47] Compl. ¶ 48; MA § 6.1(a).

[48] Compl. ¶ 49; MA §§ 6.1(a), 6.5.

[49] Compl. ¶ 50.  The Best Efforts Covenant, includes, but is not limited to, Parent's covenant to use reasonable best efforts to have the SEC declare the S-4 effective as promptly as practicable.  *See* MA §§ 6.1(a), 6.5.

[50] Compl. ¶ 54; MA § 8.1(b)(i).

[51] *Id.*

(A) the failure to satisfy the conditions to the obligations of the terminating party to consummate the Merger set forth in Article VII prior to the Outside Date or (B) the failure of the Closing to occur by the Outside Date."[52]  In the Effect of Termination Provision, the parties agreed that, "[i]n the event of any termination of this Agreement . . . , the obligations of the parties shall terminate and there shall be no liability on the part of any party with respect thereto," with limited exceptions not relevant here.[53]  The parties agreed, however, that termination shall not "relieve any party from liability for damages arising out of any fraud occurring prior to such termination."[54]

## D. Parent Delays in Preparing and Filing the S-4

As noted, the S-4 filing was essential to the Closing, mainly because the Merger consideration would consist of newly issued Convertible Preferred Stock that needed to be registered.[55]  Key to the timing of Parent's preparation of the S-4 was whether Parent would have to include *pro forma* financials for the post-Merger

---

[52] *Id.*

[53] MA § 8.2; Compl. ¶ 56.

[54] *Id.*

[55] *Id.*

company. [56] And that determination would depend upon the results of a "significance test."[57]

While Parent historically prepared its financials in accordance with U.S. Generally Accepted Accounting Principles ("GAAP"), as a company operating primarily out of India, Yatra historically prepared its financials under the International Financial Reporting Standards ("IFRS"). [58] Aware that converting Yatra's financials from IFRS to GAAP would be time-intensive, immediately after signing the Merger Agreement, Yatra began pushing Parent to determine whether *pro forma* financials would be necessary.[59] Despite Yatra's requests, Parent delayed conducting its significance test analysis; when it finally was completed, that analysis revealed that *pro forma* financials would be required.[60] That, in turn, further delayed preparation of the S-4 and ultimately the Closing.[61]

---

[56] Compl. ¶ 57. The details of the of the "significance test[ing]" are not provided in the Complaint.

[57] *Id.*

[58] Compl. ¶ 58.

[59] Compl. ¶¶ 59–60.

[60] *Id.*

[61] *Id.*

## E. Parent Conducts a Pretextual Renegotiation

Shortly before the initial Outside Date, in late March 2020, Parent was severely impacted by the COVID-19 pandemic and approached Yatra about renegotiating specific terms of the Merger Agreement.[62]  While reserving all of its rights under the Merger Agreement, Yatra reluctantly agreed to renegotiate in hopes of closing the Merger and avoiding the cost of litigation.[63]  With Yatra committed to renegotiating, Parent sought repeated extensions of the Outside Date and proposed revisions to a number of material deal terms, including an attempt to eliminate the Put Right.[64]

Meanwhile—unbeknownst to Yatra—Parent and the Lender Defendants were negotiating the Tenth Amendment, which essentially would prohibit Parent from issuing the Put Right.[65]  Parent and the Lender Defendants executed the Tenth Amendment on May 7, 2020, despite Parent's knowledge that the Put Right was a crucial component of the Merger consideration payable to Yatra and that entering into the Tenth Amendment would make payment of the Put Right impossible.[66]

---

[62] Compl. ¶ 127.

[63] Compl. ¶ 130.

[64] Compl. ¶¶ 131, 133.

[65] Compl. ¶¶ 134–35.

[66] Compl. ¶¶ 153–57; 172.

## F. Parent Continues to Delay Closing

After Parent finalized the Tenth Amendment, it continued to string Yatra along via renegotiations and Outside Date extensions.[67] On May 14, 2020, Yatra and Ebix agreed to a fourth extension of the Outside Date (the "Extension Agreement").[68] The Extension Agreement requires that Ebix: make its officers and legal counsel available for diligence sessions as "necessary to satisfactorily assess the diligence issues" (the "Diligence Covenant"); provide Yatra a proposed draft of the revised certificate of designation of the Convertible Preferred Stock, which must clearly set forth Ebix's proposed modified terms (the "COD Covenant"); provide Yatra with a proposed draft Merger Agreement amendment, which "shall clearly articulate and set forth Ebix's proposed modified terms and shall include provisions for an interim financing"; and "promptly provide revised drafts of transaction documents . . . and negotiate in good faith with Yatra." (the "Good Faith Covenant.")

---

[67] Compl. ¶ 175.

[68] Compl. ¶ 180; Pl.'s Omnibus Answering Br. in Opp'n to Defs.' Mots. to Dismiss (D.I. 62) ("PAB") Ex. 6 ("EA") at 1.

Ebix is alleged to have breached the Extension Agreement by: refusing to provide diligence details and the proposed draft of the certificate of designation of the Convertible Preferred Stock; modifying the agreed terms to the amendment; and failing to respond to Yatra's term sheet proposing revisions to the deal.[69] The final Outside Date of June 4, 2020, came and went without any hint that Parent was prepared to close.[70]

## G. Procedural History

On June 5, 020, the day after the final Outside Date, Yatra terminated the Merger Agreement and filed this action for breach of contract against Ebix.[71] On June 19, 2020, Parent secured clearance of all of its SEC comment letters.[72] On August 9, 2020, Parent filed a form 10-Q that included a disclosure related to the

---

[69] Compl. ¶¶ 180, 182, 184, 185–86, 191–92. I note that the draft amendment to the Merger Agreement that Ebix delivered to Yatra included several new terms that are not specifically addressed in this opinion, which are referred to by the parties as "Heads of Terms." Included among these new terms was a loan from Parent to Yatra for $10 million. Yatra alleges the structure of this loan was "predatory." I need not address the terms added to the draft amendment to the Merger Agreement because the parties never entered into the proposed amendment, and therefore are not bound by its terms. Compl. ¶¶ 144, 234.

[70] Compl. ¶ 193.

[71] D.I. 1; Compl. ¶ 193.

[72] Compl. ¶ 194.

Tenth Amendment.[73] Yatra filed the now-operative Complaint on September 25, 2020.[74]

Yatra's Complaint comprises five counts. Count I alleges that Ebix breached several of the Merger Agreement's provisions, including the Accuracy Rep, the Accounting Reps, the S-4 Covenants and the Best Efforts Covenant.[75] Count II alleges that Ebix breached several of the Extension Agreement's provisions, including the Diligence Covenant, the COD Covenant, and the Good Faith Covenant.[76] In Count III, Yatra alleges that Ebix breached the covenant of good faith and fair dealing implied within the Merger Agreement and the Extension Agreement.[77] In Count IV, Yatra alleges that Ebix committed fraud when Ebix intentionally delayed the consummation of the Merger Agreement, to Yatra's detriment, through misrepresentations and acts of deceit.[78] And, in Count V, Yatra alleges the Lender Defendants tortiously interfered with the Merger Agreement by entering into the Tenth Amendment and thereby destroying the economic value of

---

[73] Compl. ¶ 174.

[74] D.I. 27.

[75] Compl. ¶¶ 195–99.

[76] Compl. ¶¶ 200–04.

[77] Compl. ¶¶ 205–15.

[78] Compl. ¶¶ 216–39.

the Put Right.[79]  After the parties briefed Defendants' motions to dismiss, the Court heard oral argument on June 17, 2021, and the matter was deemed submitted for decision that day.[80]

## II. ANALYSIS

Chancery Rule 12(b)(6) requires dismissal of a complaint if the plaintiff could not recover under "any reasonably conceivable set of circumstances susceptible of proof" based on the complaint's well-pled facts.[81]  While the court need not accept conclusory allegations or "every strained interpretation of the allegations proposed by plaintiff,"[82] it "must accept as true all well-pled allegations in the complaint and draw all reasonable inferences from those facts in plaintiff's favor."[83]

---

[79] Compl. ¶¶ 240–45.

[80] D.I. 51 (Lender Defs.' Opening Br. in Supp. of Mot. to Dismiss Count V of Pl.'s Verified Am. Compl.) ("LDOB"); D.I. 53 (DOB); D.I. 62 (PAB); D.I. 76 (Lender Defs.' Reply Br. in Supp. of Mot. to Dismiss Count V of Pl.'s Verified Am. Compl.) ("LDRB"); D.I. 79 (Ebix Defs.' Reply Br. in Further Supp. of Their Mot. to Dismiss the Verified Am. Compl.) ("DRB"); D.I. 87 (Tr. of 5.17.21 Oral Arg. on Defs.' Mots. to Dismiss) ("Oral Arg. Tr.").

[81] *See Gen. Motors*, 897 A.2d at 168; *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

[82] *Id.*

[83] *In re Rouse Props., Inc.*, 2018 WL 1226015, at *10 (Del. Ch. Mar. 9, 2018) (citations omitted).

## A. Count I – Breach of the Merger Agreement

In Count I, Yatra claims Ebix breached the Merger Agreement. "Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) a resulting damage to the plaintiff."[84] "[Because] [t]he construction of a contract is a question of law,"[85] it is well understood that "a motion to dismiss is a proper framework for determining the meaning of contract language."[86]

Ebix's showcase argument is that Yatra's decision to terminate the Merger Agreement bars its claims for breach of contract under the unambiguous terms of the Effect of Termination provision. That provision reads in full:

> **Section 8.2 Effect of Termination**. In the event of **any termination** of this Agreement as provided in Section 8.1, **the obligations of the parties shall terminate and there shall be no liability on the part of any party with respect thereto**, **except for** the confidentiality provisions of Section 6.4 (Access to Information) and the provisions of Section 3.26 (No Other Representations and Warranties; Disclaimers), Section 4.17 (No Expenses), this Section 8.2, Section 8.3 (Termination Fees) and Article IX (General Provisions), each of which shall survive the termination of this Agreement and remain in full force and effect; provided, however, that, subject to Section 8.3(a)(iii), **nothing contained herein shall relieve any party from liability for damages arising out of any fraud occurring prior to such termination**, in which case the aggrieved party shall be entitled to all rights and

---

[84] *77 Charters, Inc. v. Gould*, 2020 WL 2520272, at *19 (Del. Ch. May 18, 2020) (internal quotations omitted).

[85] *Id.*

[86] *Majkowski v. Am. Imaging Mgmt. Servs., LLC*, 913 A.2d 572, 581 (Del. Ch. 2006).

21

remedies available at law or equity. The parties acknowledge and agree that nothing in this Section 8.2 shall be deemed to affect their right to specific performance under Section 9.9 prior to the valid termination of this Agreement. In addition, the parties agree that the terms of the Confidentiality Agreement shall survive any termination of this Agreement pursuant to Section 8.1 in accordance with its terms.[87]

Ebix asserts that, under this provision, Yatra's decision to terminate the Merger Agreement eliminated any potential "liability . . . with respect" to the "obligations" arising from the Merger Agreement, including in particular Yatra's claim that Ebix breached the Merger Agreement. Yatra responds that the phrase "with respect thereto" can reasonably be read to modify "any termination of this Agreement" (as opposed to "obligations"). Under this construction, the Effect of Termination provision cannot be understood to eliminate damages owed for prior breaches of "obligations," but only damages caused by the act of terminating the Merger Agreement. Thus, according to Yatra, the Effect of Termination provision does not by its terms extinguish all claims for breach of the Merger Agreement; instead, it serves only to make clear which contractual obligations carry forward post-termination and which do not. At best, Yatra says, the Merger Agreement is ambiguous as to the effect of termination on a party's post-termination remedies.

---

[87] MA § 8.2 (emphasis added).

Of course, "[a]n agreement is not ambiguous [simply] because the parties disagree about its interpretation."[88]  Rather, "a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[89]  "By contrast, a contract is unambiguous when the agreement's ordinary meaning leaves no room for uncertainty, and the plain, common, and ordinary meaning of the words . . . lends itself to only one reasonable interpretation."[90]

Yatra's reading of the Effect of Termination provision stretches the words beyond their tolerance.  The comma following "Section 8.1" breaks the sentence, reading naturally to indicate the Merger Agreement's drafters intended the phrase "with respect thereto" to modify "the obligations of the parties" as opposed to "any termination of this agreement."[91]  Further, Yatra's position—that the provision only extinguishes liability arising from "any termination of this Agreement"—is

[88] *Sage Software, Inc. v. CA, Inc.*, 2010 WL 5121961, at *6 (Del. Ch. Dec. 14, 2010), *aff'd*, 27 A.3d 552 (Del. 2011) (TABLE).

[89] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorist Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[90] *Pearl City Elevator, Inc. v. Gieseke*, 2021 WL 1099230, at *9 (Del. Ch. Mar. 23, 2021).

[91] To the extent Yatra is seeking to invoke the so-called "last antecedent rule," that rule actually supports Ebix's construction.  *See Rag Am. Coal Co. v. AEI Res., Inc.*, 1999 WL 1261376, at *4 (Del. Ch. Dec. 7, 1999) ("[O]ridinarily, qualifying words or phrases, where no contrary intention appears, usually relate to the last antecedent.") (citation omitted).  The only "antecedents" at work in the clause at issue are "obligations" and "liability," both of which "terminate" upon termination of the Merger Agreement.

inconsistent with the language immediately following "with respect thereto," which "except[s]" certain *obligations* under the Merger Agreement, as specifically enumerated, from the effects of the contractual limitation of liability. That clause would be superfluous if the effect of the provision was to limit liability only arising from the act of terminating the Merger Agreement.[92] Moreover, contrary to Yatra's contention that termination leaves claims for breach of contract based on prior acts unaffected, Section 8.2 expressly carves out only liability for "fraud occurring prior to such termination," implying that liability for all other claims (including contract-based claims) for acts "occurring prior" to termination do no survive post-termination.[93]

---

[92] *See Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage."), *see also* Restatement (Second) of Contracts § 203 ("In the interpretation of a promise or agreement or a term thereof, the following standards of preference are generally applicable: (a) an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."); *id.* cmt. b ("Since an agreement is interpreted as a whole, it is assumed in the first instance that no part of it is superfluous.").

[93] Though Yatra places great weight on its (disputed) contention that it filed the Original Complaint before effectively terminating the Merger Agreement, Section 8.2 expressly states that following "any termination," "the obligations of the parties shall terminate and there shall be no liability on the part of any party with respect thereto," except "for damages arising out of any fraud occurring prior to such termination." MA § 8.2. By expressly terminating all liability of the parties (except "fraud occurring prior to such termination") following termination, the Effect of Termination provision makes clear that the act of termination extinguishes liability then and there, regardless of whether a claim is pending before termination. *See* 17A Am. Jur. 2d Contracts § 709 (2004) ("Where a contract

Indeed, Section 8.2's language is not *terra incognita*; Vice Chancellor Laster considered a substantively similar effect of termination provision containing a broad waiver of contractual liability, modified by two exceptions, in *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*.[94] There, the court observed that the provision and its exceptions were "pretty standard" and cited extensive secondary sources, including leading treatises, explaining that the consequences of termination are "usually [ ] that all of the provisions, with a few possible exceptions, will terminate and no longer be of any force and effect."[95] In other words, the court endorsed Ebix's construction of the Effect of Termination Provision here.

At oral argument, Yatra attempted to distinguish *AB Stable* by pointing out that the effect of termination provision at issue there included the phrase "this

---

prescribes a remedy for a breach, that remedy is generally exclusive if the contract so declares or clearly shows the parties' intention to make it so." (internal citations omitted)).

[94] 2020 WL 7024929, at *104 (Del. Ch. Nov. 30, 2020). It is telling that Yatra did not address *AB Stable* on brief even after Ebix prominently featured that case in its opening submission. *See* DOB at 25–26.

[95] *AB Stable*, 2020 WL 7024929, at *104 n.311 (citing Lou R. Kling & Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions*, § 15A.02 at 15A-4.3 (2020 ed.) (noting the effect of a provision broad that eliminates liability upon termination suggesting that "[it] is important . . . to continue and carve out a proviso to the effect that the foregoing will not relieve any party for liability for its breach of any provision prior to termination. Failure to do this could leave the aggrieved party without a remedy, particularly if the breaching party was the one to terminate."); ABA Mergers & Acqs. Comm., *Model Tender Offer Agreement* 240 (2020) (discussing exceptions to a provision contemplating no liability upon termination and stating that, "[w]ithout this proviso, the language in Section 8.02 would provide that neither party would be liable for breach to the other after termination regardless of pre-closing breaches")).

Agreement shall forthwith become void" upon termination, whereas that phrase is not included in the Effect of Termination provision at issue here.[96] But, as Yatra admitted at oral argument,[97] the court in *AB Stable* expressly observed that "[u]nder the common law, termination results in an agreement becoming void, but that fact alone does not eliminate liability for a prior breach."[98] The court went on to explain that when parties include a provision stating that "there shall be no liability on the part of either party" upon termination, they "alter[] the common law rule" and "broadly waive[] contractual liability and all contractual remedies."[99] The Merger Agreement's Effect of Termination Provision contains language nearly identical to *AB Stable*'s hypothetical, providing that there "shall be no liability on the part of *any* party" in the event of termination, rendering the basis for Yatra's proffered distinction illusory.[100]

---

[96] Oral Arg. Tr. 101:8–11.

[97] *Id.* at 101:16–21.

[98] *AB Stable*, 2020 WL 7024929, at *103.

[99] *Id.*

[100] MA § 8.2 (emphasis added). Yatra also observed at oral argument that the effect of termination provision at issue in *AB Stable* did not have the "with respect thereto" language which, according to Yatra, is what inserts ambiguity into the Merger Agreement's Effect of Termination Provision. Oral Arg. Tr. 101:24–102:3. But the point to draw from *AB Stable* is how an effect of termination provision with the "no liability" language operates. As the court there observed, that language makes clear the parties' intent that termination of the agreement will eliminate liability of both parties except to the extent

Yatra next contends that a reading of the broader Merger Agreement conflicts with Ebix's construction of the Effect of Termination provision. Specifically, according to Yatra, Ebix's reading of Section 8.2 conflicts with Section 9.9(c) and Section 9.1.

Section 9.9(c) reads:

> (ii) nothing set forth in this Section 9.9 shall require any party to institute any Proceeding (or limit any party's right to institute any Proceeding) for *specific performance . . . prior or as a condition to exercising any termination right* under Section 8.1, nor shall the commencement of any Proceeding . . . restrict or limit any party's right to **terminate the Agreement** in accordance with the terms of Section 8.1 **or** pursue any other remedies (*including monetary damages*) in respect of this Agreement or the transactions contemplated thereby . . .[101]

There is no discernible conflict between Ebix's construction of Section 8.2 and Section 9.9(c). Section 9.9(c) plainly provides only that a party need not sue for specific performance before terminating the Merger Agreement.[102] The disjunctive

---

expressly carved-out in the provision. That is precisely what the parties agreed to in the Merger Agreement.

[101] MA § 9.9(c) (emphasis added).

[102] Yatra proposes that Section 9.9(c) allows for a party to terminate the contract and then sue for specific performance. PAB at 32. But Section 9.9(c) does not say that. It states simply that a party is not prevented from suing for specific performance before exercising its termination right. It would make no sense for a party to terminate the agreement, only to turn around and sue for specific performance, and Section 9.9(c) does not provide for that scenario. *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, (Del. 2010) (holding that a party seeking specific performance must demonstrate, *inter alia*, that she "is ready, willing and able to perform").

between a reference to termination and the pursuit of other remedies "(including monetary damages)" reveals an intent that a party may *either* terminate the Merger Agreement (one contractual remedy for breach) *or* "pursue any other remedies." Thus, the parties contemplated termination as a remedy distinct from others, which makes perfect sense in view of Section 8.2's unambiguous provision that when a party elects to terminate the Merger Agreement, that termination eliminates any party's liability for damages arising from a breach occurring prior to termination.

Yatra's argument under Section 9.1 fares no better. That provision provides in relevant part:

> [R]epresentations, warranties, covenants and agreements in this Agreement and in any certificate or other writing delivered pursuant hereto shall not survive the consummation of the Merger or the termination of this Agreement, subject to Sections 8.2 and 8.3.[103]

Yatra argues that the survival clause functions to cut off the parties' continuing obligations to comply with the Merger Agreement's provisions *after* the consummation of the Merger or the termination of the Merger Agreement, but does not affect the parties' rights to sue for *prior* breaches.

Contrary to Yatra's argument that the survival clause makes clear that only the obligations set forth in the Merger Agreement (and not the remedy for prior breaches of those obligations) are extinguished post-termination, this court has

---

[103] MA § 9.1.

explained that "where the contract expressly provides that the representations and warranties terminate upon closing, so do any remedies for breach of those representations and warranties."[104] According to Yatra, the holding in *GRT* is inapt because Yatra has brought its claims for breach post-termination, not post-closing.[105] But this argument ignores that Section 9.2 treats termination as equivalent to closing, stating that "representations, warranties, covenants and agreements . . . shall not survive the consummation of the Merger *or the termination of this Agreement, subject to Sections 8.2* and 8.3."[106] As noted, Yatra's reading simply cannot be squared with Section 8.2's broad elimination of liability following termination. The only way to square Section 8.2 with Section 9.1 is to understand the survival clause to provide that termination operates as if the parties consummated the Merger Agreement—eliminating both sides' liability for any claim arising out of the contract.

In a last gasp, Yatra protests that Ebix's construction results in absurdity, as it would require Yatra to have sued for breach of contract without terminating the

---

[104] *GRT*, 2011 WL 2682898, at *13, *see also id.* ("[A]ll major commentaries agree that by expressly terminating representations and warranties at closing, the parties have made clear their intent that they can provide no basis for a post-closing suit seeking a remedy for an alleged misrepresentation"); *id.* at *12 (explaining that Delaware law does not require survival clauses to contain express language limiting remedies).

[105] PAB at 36.

[106] MA § 9.2 (emphasis added).

Merger Agreement.[107] But there is nothing absurd about a contract that, in essence, requires parties to sue for breach without terminating the agreement.[108] Indeed, by Yatra's own admission, its obligations under the Merger Agreement "ceased, because Ebix materially breached the Merger Agreement."[109] Thus, the Merger Agreement provided a choice to a party faced with a breach by the counterparty: either (a) sue for damages (or specific performance) or (b) terminate the Merger Agreement and extinguish liability for all claims arising from the contract (except those specifically carved-out, including claims for fraud). The latter option would be preferable where, for example, the terminating party believed it had some liability exposure of its own and would prefer to terminate the Merger Agreement to eliminate that risk. This is a perfectly logical way for parties contractually to manage risk, and it is not for this Court to redline the parties' bargained-for limitations of liability because one party now regrets the deal it struck.[110]

---

[107] PAB at 32.

[108] *See* 17A Am. Jur. 2d Contracts, § 711 (Aug. 2021 Update) (observing that a party to a contract may elect "to keep the contract alive" by "remaining at all times ready, willing, and able to perform their part of the contract" while still maintaining a claim for breach of contract against the counterparty).

[109] *Id.* at 32 n.21.

[110] *See GRT*, 2011 WL 2682898, at *6; *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) (explaining the Court will "not rewrite the contract to appease a party who later wishes to rewrite a contract").

Yatra agreed that termination of the Merger Agreement would terminate liability for breach of that contract. Accordingly, its post-termination claim for breach of the Merger Agreement, as stated in Count I, must be dismissed.

## B. Count II – Breach of the Extension Agreement

In Count II, Yatra asserts that Ebix breached the Extension Agreement. According to Yatra, even if the Court finds that Count I fails under the Merger Agreement's Effect of Termination Provision, the Extension Agreement is a standalone agreement unaffected by any limitations the parties may have agreed to in other contracts.[111]

Yatra's argument cannot be squared with the plain text of either the Merger Agreement or the Extension Agreement. The Extension Agreement is intended, as its name suggests, to modify the Merger Agreement by extending the agreed upon Outside Date.[112] Not surprisingly, the Extension Agreement refers to the Merger Agreement in its very first sentence, incorporates the capitalized terms in the Merger Agreement and is replete with references to the Merger Agreement. [113]

---

[111] Oral Arg. Tr. 116:3–5.

[112] PAB, Ex. 6 ("EA") at 1.

[113] *Id.* at 1 ("Reference is hereby made to the Merger Agreement . . . . All capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Merger Agreement. By signing . . . below, and subject to the following agreements, the Parties hereby agree that the Outside Date in the Merger Agreement shall be further extended to . . . June 4, 2020 . . ."); *id.* at 2 ("In the event that Ebix fails to comply with the provisions in clauses (i)–(iv) above, Yatra shall have the right to immediately terminate

Conspicuously absent from the Extension Agreement, however, is an integration clause.[114]  Indeed, there is nothing in the Extension Agreement that provides or even suggests it stands apart from the terms and structure of the Merger Agreement, including the Effect of Termination provision.  On the contrary, the parties agreed in the Extension Agreement:

> With the sole exception of the amendment to the Outside Date set forth in this letter agreement, the Merger Agreement remains unchanged and continues in full force and effect.  By entering into this letter agreement, neither Party shall be deemed to waive or otherwise impair any of its rights under the Merger Agreement or preclude any other or further exercise of such rights or any other rights under the Merger Agreement. Both Parties expressly reserve their rights under the Merger Agreement and in law and equity.[115]

That language clearly indicates the Extension Agreement was intended narrowly to modify the Merger Agreement's provisions, with all rights and obligations therein otherwise expressly reserved.

The Merger Agreement, for its part, explicitly contemplates "other writings delivered pursuant" thereto, like the Extension Agreement, stating that any representations in "other writings" "shall not survive the consummation of the

---

this letter agreement by written notice in accordance with the provisions of Section 9.2 of the Merger Agreement . . . .").

[114] *See generally id.*

[115] EA at 2.

Merger or the termination of this Agreement."[116] For reasons already explained, the termination of the Merger Agreement eliminates claims for prior breaches of contract. Thus, like Count I, Yatra's decision to terminate the Merger Agreement insulated Ebix from liability for alleged breaches of the Extension Agreement. Defendants' motion to dismiss Count II is granted.

## C. Count III – Breach of the Implied Covenant of Good Faith and Fair Dealing

In Count III, Yatra asserts that Ebix breached the implied covenant of good faith and fair dealing under the Merger Agreement and the Extension Agreement in two ways. First, Yatra claims Ebix breached the implied covenant by purporting to renegotiate the terms of the Merger Agreement, without any intention of closing those renegotiated terms, to induce Yatra to forbear from exercising remedies before Parent could amend its Credit Agreement, finalize its audit and announce its financial results.[117] Second, Yatra claims that Parent breached the implied covenant by entering into the Tenth Amendment, effectively foreclosing the issuance of the Put Right or the payment of any consideration other than stock.[118]

---

[116] MA § 9.1.

[117] PAB at 38.

[118] *Id.* at 42.

33

Under Delaware law, the implied covenant of good faith and fair dealing is "a limited and extraordinary legal remedy."[119] "As such, the implied covenant does not apply when the contract addresses the conduct at issue, but only when the contract is truly silent concerning the matter at hand."[120] Even if the contract is silent, "[a]n interpreting court cannot use an implied covenant to re-write the agreement between the parties, and 'should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.'"[121]

With respect to Yatra's first implied covenant theory, the contract is not silent as to Ebix's obligations. Section 6.5 of the Merger Agreement requires the parties to "use their reasonable best efforts to take, or cause to be taken, as promptly as practicable, all actions necessary, proper or advisable to consummate the Merger as promptly as practicable . . . ."[122] Romanette iv of the Extension Agreement obligates Ebix to "negotiate in good faith with Yatra and its advisors . . . ."[123] These provisions

---

[119] *Nemec*, 991 A.2d at 1128.

[120] *Oxbow Carbon & Mins. Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 507 (Del. 2019) (internal quotations and citations omitted).

[121] *Nationwide Emerging Managers, LLC v. Northpointe Hldgs., LLC*, 112 A.3d 878, 897 (Del. 2015) (quoting *Allied Cap. Corp. v. GC–Sun Hldgs., L.P.*, 910 A.2d 1020, 1035 (Del. Ch. 2006) (Strine, V.C.)).

[122] MA § 6.5.

[123] EA at 1.

would provide Yatra a contractual hook to hold Ebix to account for its alleged bad faith foot-dragging and Parent's subsequent entry into the Tenth Amendment; indeed, Yatra has attempted to do precisely that in Counts I and II of its Complaint.[124] Instead, Yatra elected to terminate the Merger Agreement and, in doing so, terminated its right to pursue a claim for breach of contract as well.[125] As our Supreme Court has explained, "[t]he implied covenant of good faith and fair dealing involves inferring contractual terms to handle developments or contractual gaps that neither party anticipated. It does not apply when the contract addresses the conduct at issue."[126]

Yatra's second theory fails for the same reasons as its first—the contract occupies the space Yatra seeks to fill with the implied covenant. According to Yatra,

---

[124] *See* Compl. ¶¶ 195–204; *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 272–73 (Del. 2017) (holding a provision requiring "commercially reasonable efforts" imposed "an affirmative obligation on the parties" and reversing the lower court for focusing only "on the absence of any evidence" when finding that the provision was not breached).

[125] To support its contention that a breach of the implied covenant is not foreclosed by a reasonable best efforts provision, Yatra cites cases applying foreign law. PAB at 40 (citing *Liberty Prop. Ltd. P'ship v. 25 Mass. Ave. Prop. LLC*, 2008 WL 1746974, at *13 n.60 (Del. Ch. Apr. 7, 2008) (applying D.C. law) and *Rus, Inc. v. Bay Indus., Inc.*, 322 F. Supp. 2d 302 (S.D.N.Y. 2003) (applying New York law)). There is no point in addressing these authorities as Delaware law on the subject is clear. There is no basis to imply a covenant of good faith and fair dealing where the express terms of the contract address the matter in question, including a parties' obligation to use best efforts to complete a designated task. *Oxbow Carbon*, 202 A.3d at 507.

[126] *Nationwide Emerging Managers*, 112 A.3d at 896 (cleaned up).

Parent breached the implied covenant when it entered into the Tenth Amendment without ever disclosing the amendment to Yatra, thereby effectively prohibiting Ebix from closing the Merger with its Put Right intact or suing for specific performance.[127] But the Merger Agreement specifically addresses Ebix's obligation to consummate the transaction without triggering an event of default under an agreement to which Parent or Merger Sub is bound. In Section 4.4 of the Merger Agreement, Ebix represents to Yatra that Ebix's execution, delivery, and performance of the Merger Agreement and its consummation of the Merger do not and will not "violate, conflict with, result in the loss of any benefit under, constitute a default (or an event which, with or without notice or lapse of time, or both, would constitute a default) under . . . any Contract to which Parent or Merger Sub is a party, or by which they or any of their respective properties or assets are bound or affected . . ."[128] One of Yatra's closing conditions was that Ebix's representations and warranties, as set forth in Section 4.4, are "true and correct" as of the Signing Date and as of the Closing.[129]

Yatra alleges the Tenth Amendment prohibits Ebix from closing the Merger with Yatra's Put Right intact because doing so would cause Parent to default on the

---

[127] Compl. ¶¶ 213–15.

[128] MA § 4.4.

[129] MA § 7.3(a).

Credit Agreement. [130]   Section 7.3 of the Merger Agreement explicitly provides that Ebix must be able to consummate the Merger without defaulting on the Credit Agreement, and so the "[e]xisting contract terms control . . . such that implied good faith cannot be used to circumvent the parties' bargain."[131]

Because the Merger Agreement leaves no gap to fill with the implied covenant, the motion to dismiss Count III must be granted.[132]

## D. Count IV – Fraud

In Count IV, Yatra asserts it was defrauded by Ebix.  To be clear, Yatra's claim is not premised on a fraudulent inducement theory, nor is it premised upon a contractual fraud theory, i.e., that Ebix made knowingly false representations in the Merger Agreement itself.   Instead, Yatra's fraud claim—asserted only in its Amended Complaint after Ebix briefed in its original motion to dismiss the

---

[130] Compl. ¶¶ 213–15.

[131] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005); see also *Shenandoah Life Ins. Co. v. Valero Energy Corp.*, 1988 WL 63491, at \*8 (Del. Ch. June 21, 1988) ("Where . . . a specific, negotiated provision directly treats the subject of the alleged wrong and has been found to have not been violated, it is quite unlikely that a court will find by implication a contractual obligation of a different kind that has been breached.").

[132] I note separately that, in my view, where an implied covenant relates to contractual commitments that cease to operate upon termination, the covenant itself would likely also be extinguished.  I need not rest dismissal on that ground, however, because Yatra's implied covenant claim fails for other reasons.  Moreover, Yatra's implied covenant claims, both of which implicate the same conduct that animates its fraud claim, appear to be attempts to dress down a fraud claim in order to avoid the more stringent pleading burdens imposed by Chancery Rule 9(b).  That, too, is likely improper.  But again, I need not decide the motion to dismiss Count III on that ground.

consequences of the Merger Agreement's Effect of Termination provision—is premised on a theory of promissory fraud, i.e., that Parent made knowingly false "promises or predictive statements of future intent rather than past or present facts."[133] Specifically, Yatra alleges that Ebix made extra-contractual promises that it was willing to renegotiate the Merger Agreement's terms when, in fact, it had no intent to close on the renegotiated terms (or any commercially reasonable terms for that matter). According to Yatra, Ebix strung Yatra along to induce it to forbear from exercising remedies until Parent could get its house in order by amending its Credit Agreement, finalizing its audit and announcing its financial results.[134]

> To state a claim for fraud under Delaware law, a plaintiff must allege:
>
> (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance.[135]

---

[133] *MicroStategy, Inc. v. Acacia Rsch. Corp.*, 2010 WL 5550455, at *15 (Del. Ch. Dec. 30, 2010).

[134] Compl. ¶¶ 217, 225, 236.

[135] *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 958 (Del. 2005). The fifth element— that 'the plaintiff was injured by its reliance'—injects a causation inquiry into the fraud cause of action. *See In re Wayport, Inc. Litig.*, 76 A.3d 296, 325 (Del. Ch. 2013) (holding that, to be actionable, "the fraudulent misrepresentation must actually cause harm") (citations omitted).

Fraud claims are subject to Chancery Rule 9(b), which requires the plaintiff to allege the "circumstances constituting fraud . . . with particularity."[136] The relevant circumstances are "the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the misrepresentation; and what that person(s) gained from making the misrepresentation."[137] "The core test is whether the claim has been pled with detail sufficient to apprise the defendant of the basis for the claim."[138]

Even assuming *arguendo* that Yatra's premise for its fraud claim is sound— i.e., that Yatra was somehow frustrated in its ability to hold Ebix to the bargain it struck by Ebix's inexcusable delay[139]—the claim nonetheless fails for lack of loss

---

[136] Ct. Ch. R. 9(b).

[137] *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 207–08 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007) (TABLE).

[138] *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 142 (Del. Ch. 2009) (internal quotations and citations omitted).

[139] There is serious reason to doubt this premise. *See Shah v. Shah*, 1988 WL 67403, at *3 (Del. Ch. June 28, 1988) ("Mere inconvenience or substantial increase in the cost of compliance with a contract though they might make compliance a hardship, cannot excuse a party from the performance of an absolute and unqualified undertaking to do a thing that is possible and lawful. Courts cannot alter contracts merely because they work a hardship. A contract is not invalid, nor is the obligor therein in any manner discharged from its binding effect, because it turns out to be difficult or burdensome to perform." (quoting *Safe Harbor Fishing Club v. Safe Harbor Realty Co.*, 107 A.2d 635, 638 (Del. Ch. Aug. 3, 1988)); *Estate of Necastro*, 1993 WL 315464, at *3 (Del. Ch. Aug. 3, 1993) (finding that "[m]ere inconvenience or substantial increase in the cost of compliance" did not excuse obligations under terms of settlement agreement).

causation. Yatra alleges that, but for Ebix's false promises that it would engage in meaningful negotiations while Parent secretly bargained for and then consummated the Tenth Amendment, Yatra would have sued for specific performance of the Merger Agreement.[140] According to Yatra, once Parent entered into the Tenth Amendment, any lawsuit for specific performance was pointless because the claim would have triggered an event of default under the Tenth Amendment, rendering Yatra's Put Right worthless.

---

[140] Compl. ¶¶ 188, ("Ebix . . . effectively gutted Yatra's valuable Put Right consideration, making specific performance of the contract impossible."), 223 ("For its part, Yatra preferred the original Merger Agreement with its ever more valuable Put Right, but also was willing to consider a renegotiation on valuable economic terms . . ."), 237 ("Yatra reasonably relied on Ebix's promises and did not act to enforce the terms of its existing Merger Agreement at a time when it had leverage to insist on its favorable Put Right and other rights."). On brief, Yatra argues exclusively that the damage suffered as a result of the fraud was the loss of its ability to sue for specific performance. PAB at 52 ("By its fraud, Parent lulled Yatra into granting multiple extensions of the Outside Date and not filing the Original Complaint until June 4, 2020. By this point in time, the specific performance remedy was both unlikely legally ('a party seeking specific performance must act with alacrity or lose its rights') and infeasible practically (there was too much bad blood between the parties for a harmonious business combination). Thus, and as described in more detail below, because of Ebix's fraud, specific performance was off the table by the time of filing of the Original Complaint."); *id.* at 53 ("By this point in time, specific performance was effectively foreclosed as a remedy, since it would have caused an *immediate* event of default under the Credit Agreement. Yatra clearly had a contractual right to seek specific performance under the Merger Agreement, and like all contractual rights the right to seek specific performance has value. Parent, with the help of its lenders *gutted* that right by surreptitiously contracting away its ability to issue the Put Right under the Tenth Amendment." (emphasis in original)). To the extent Yatra could have contended it suffered other harm as a result of the alleged fraud (unlikely), it has waived that argument now. *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

40

The problem with Yatra's theory is that specific performance of the Merger Agreement was never an option in any event because, as Yatra affirmatively pleads, the SEC never declared the S-4 effective.[141] And, as the Complaint acknowledges, "[i]n order for [Parent] to be able to issue [the Put Right] . . . to Yatra as Merger consideration, the SEC had to declare effective the S-4."[142] Yatra was aware of Parent's troubles with the SEC well before Parent engaged Yatra in the allegedly fraudulent renegotiations that purportedly frustrated Yatra's right to specific performance.[143] Indeed, this frustration animates Yatra's claim for breach of contract in Count I, where Yatra alleges Parent failed to use its "reasonable best efforts" to have the SEC declare the S-4 effective "as promptly as practicable."[144] Thus, Yatra's own pleading belies its effort to pin its inability to sue for specific performance on Parent's separate renegotiation of the Tenth Amendment and, for

---

[141] Compl. ¶¶ 49, 84, 91.

[142] Compl. ¶ 49. *See also* Compl. ¶¶ 43, 48–49 (acknowledging that "an effective S–4 was a condition to closing").

[143] Compl. ¶¶ 98–122, 133.

[144] MA § 6.1; Compl. ¶ 198. I note that the Complaint alleges that Ebix failed to use its "reasonable best efforts" to have the SEC declare the S-4 effective, but the Merger Agreement provides that this obligation applies only to Parent and not Parent and Merger Sub.

that reason, its fraud claim fails.[145] Accordingly, Defendants' motion to dismiss Count IV must be granted.

### E. Count V – Tortious Interference with Contract

In Count V, Yatra asserts the Lender Defendants tortiously interfered with the Merger Agreement by entering into the Tenth Amendment. Specifically, Yatra alleges the Tenth Amendment made the issuance of the Put Right impractical and thereby "sabotaged the Merger all together by contractually prohibiting Ebix from issuing crucial Merger consideration."[146]

At the threshold, the parties dispute choice of law. The Lender Defendants argue the law of India should apply to Yatra's tortious interference claim, while Yatra argues Delaware law applies. For reasons explained below, there is no need for a choice of law analysis here because Yatra's tortious interference claim fails even if the Court assumes the law of Yatra's preference (Delaware) applies.

---

[145] *See Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l Fund, L.P.*, 829 A.2d 143, 159 (Del. Ch. 2003) (finding that the fourth and fifth elements of fraud are ". . . inadequately pled to meet the requirements of Court of Chancery Rule 9(b)"), *see also Brevet Cap. Special Opportunities Fund, LP v. Fourth Third, LLC*, 2011 WL 3452821, at *8 (Del. Super. Ct. Aug. 5, 2011) (dismissing claim for fraud because plaintiff merely alleged that it "suffered damages" without identifying "in any meaningful way" what those damages were); *Manzo v. Rite Aid Corp.*, 2002 WL 31926606, at *5 (Del. Ch. Dec. 19, 2002) (dismissing fraud claim for failure to well plead harm flowing from the alleged fraud), *aff'd*, 825 A.2d 239 (Del. 2003) (TABLE).

[146] PAB at 66.

To state a claim for tortious interference under Delaware law, a party must plead "(1) a contract, (2) about which [the] defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury."[147] Again, Yatra's contention that the Lender Defendants caused its injury (the loss of the Put Right) runs headlong into its allegations that Parent could not have issued the Put Right in any event due to the SEC having never declared the S-4 effective.[148] The Lender Defendants are not alleged to have had any role in Parent's troubles with the SEC, which were ongoing long before the Tenth Amendment was even contemplated.[149] Thus, the Lender Defendants' entry into the Tenth Amendment did not stand alone as an impediment to Yatra's ability to pursue specific performance of the Merger Agreement (or its bargained-for Put Right); even if the Tenth Amendment was never executed, specific

---

[147] *Aspen Advisors LLC v. UA Theater Co.*, 861 A.2d 1251, 1265–66 (Del. 2004) (quoting *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch. 1987)).

[148] Compl. ¶¶ 49, 84, 91, *see also Stone & Paper Invs., LLC v. Blanch*, 2020 WL 3496694, at *6 (Del. Ch. June 29, 2020) ("[A] claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law").

[149] *See* Compl. ¶¶ 56 (alleging the SEC declaration was due "no later than 45 days after execution of the Merger Agreement (*i.e.*, August 30, 2019)" and that "Ebix breached these obligations, along with the Best Efforts Provision, by dragging its feet with the preparation and filing of the S-4"), 87 ("[R]ather than expeditiously working to clear the SEC's comments, Ebix sought extensions to respond to each and every one of the Comment Letters, and its replies were entirely inadequate.").

performance would not have been a remedy available to Yatra. For that reason, Yatra has failed to allege that the Lender Defendants' entry into the Tenth Amendment was a "significant factor" in causing the breach of the Merger Agreement.[150] The motion to dismiss Count V, therefore, must be granted.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss are GRANTED in full.

**IT IS SO ORDERED.**

---

[150] *See Himawan v. Cephalon, Inc.*, 2018 WL 6822708, at \*11 (Del. Ch. Dec. 28, 2018) (dismissing plaintiffs' tortious interference with contract claim because "the allegations that [p]laintiffs cite, even with all reasonable inferences drawn in their favor, do not support the allegation" that [the defendants actually] interfered with the Merger Agreement . . ."); *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at \*25 (Del. Ch. Nov. 17, 2014) (stating a tortious interference claim requires an act "that is a significant factor in causing the breach of such contract").